

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2001 APR 17  AM 8: 44
APR 1 7 2001
LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN THE MATTER OF THE COMPLAINT OF DIAMOND SERVICES CORPORATION, ON BEHALF OF THE DIAMOND DREDGE NO. 9 FOR EXONERATION FROM OR LIMITATION OF LIABILITY | C.A. No. 00-0156<br><br>SECTION: "L" (3) |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| JOSEPH FORET, JR. | C.A. No. 00-0708 |
| v. | SECTION: "L" (3) |
| CENTRAL GULF TOWING, INC. | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| IN THE MATTER OF CENTRAL GULF TOWING, INC., AS OWNER *PRO HAC VICE* OF THE M/V VIVIAN, PRAYING FOR EXONERATION FROM AND/OR LIMITATION OF LIABILITY | C.A. No. 00-1166<br><br>SECTION: "L" (3) |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## <u>MOTION FOR SUMMARY JUDGMENT</u>

T. Baker Smith & Son, Inc. (TBS) moves the Court for summary judgment in its

favor, dismissing the Third-Party Demands of Diamond Services Corporation (Diamond) and

Fee ____
Process ____
X Dktd ____
CtRmDep ____
Doc.No. ____

Central Gulf Towing , Inc. (Central Gulf) on the grounds that there is no disputed issue of material fact on a critical aspect of this case, as more fully shown in the Uncontested Statement of Material Facts, Appendix and Exhibits thereto, incorporated herein by reference, no activity of TBS was a cause in fact or in law of the accident at issue. Accordingly, TBS is entitled to summary judgment as a matter of law, dismissing the claims of Diamond Services Corporation and Central Gulf Towing, Inc.

CHARLES F. SEEMANN, JR. (11912)
KEITH J. BERGERON (25574)
DEUTSCH, KERRIGAN & STILES, LLP
755 Magazine Street
New Orleans, Louisiana  70130
Telephone:  (504) 581-5141
Fax:  (504) 566-1201
Attorneys for Third-Party Defendant,
T. Baker Smith & Son, Inc.

2

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **IN THE MATTER OF THE COMPLAINT OF DIAMOND SERVICES CORPORATION,** | **C.A. No. 00-0156** |
| **ON BEHALF OF THE DIAMOND DREDGE NO. 9 FOR EXONERATION FROM OR LIMITATION OF LIABILITY** | **SECTION: "L" (3)** |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

| | |
|---|---|
| **JOSEPH FORET, JR.** | **C.A. No. 00-0708** |
| **v.** | **SECTION: "L" (3)** |
| **CENTRAL GULF TOWING, INC.** | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

| | |
|---|---|
| **IN THE MATTER OF CENTRAL GULF TOWING, INC., AS OWNER *PRO HAC VICE* OF THE M/V VIVIAN,** | **C.A. No. 00-1166** |
| **PRAYING FOR EXONERATION FROM AND/OR LIMITATION OF LIABILITY** | **SECTION: "L" (3)** |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## STATEMENT OF UNCONTESTED MATERIAL FACTS
## (T. BAKER SMITH & SON, INC.'S MOTION FOR SUMMARY JUDGMENT)

The following is a statement of uncontested material facts upon which T. Baker

Smith & Son, Inc. (TBS) relies for its Motion for Summary Judgment:

1.     This suit is to determine who must bear the cost of repairing damage to a 24" gas transmission pipeline (Tennessee Pipe) owned and operated by Tennessee Gas Transmission (Tennessee Gas) in Quatre Bayou Pass in South Plaquemines Parish, Louisiana.[1]

2.     Tennessee Gas claims that the damage to the Tennessee Pipe was caused by a spud from Diamond Services Corporation's Dredge No. 9 (DS 9), when it dropped its spud on the pipeline on December 14, 1999.[2]

3.     Diamond Services Corporation (Diamond), the owner of DS 9, denies that the DS 9 spud caused the damage; and, alternatively, that if the spud did the damage, the accident and damage were caused by the fault and negligence of others, specifically employees of T. Baker Smith & Son, Inc. (TBS).[3]

4.     The DS 9 was under tow by the tugboat, M/V Vivian (*Vivian*), owned by Central Gulf Towing, Inc. (Central Gulf) when the alleged damage occurred.[4]

---

[1] Diamond Third-Party Complaint, ¶ 2.

[2] Id.; Bergeron Deposition, Attachment 1 to this Statement, pp. 70-71. Please note that the complete reduced versions of all depositions are attached preceded by the larger-print deposition pages specifically cited for easier reading.

[3] Diamond Third-Party Complaint, ¶¶ 2 and 4; Complaint, ¶ 1.

[4] Central Gulf Third-Party Complaint, ¶ 2; Pierre Deposition, Attachment 2 to this Statement, pp. 32-33.

5.    Central Gulf denies that the *Vivian* contributed to the damage to the Tennessee Pipe; and, alternatively, that if it did, the accident and damage were caused by the fault and negligence of others, specifically employees of TBS.[5]

6.    The only negligence of TBS alleged by Diamond and Central Gulf is that it was negligent in marking the position of the undersea Tennessee Pipe.[6]

7.    At the time of the accident, Chet Morrison Contractor, Inc. (CMC) was performing a contract it had with Tennessee Gas to lower the Tennessee Pipe.  Part of this contract required uncovering parts of the line which were buried under cover, so that the line could be moved and lowered.[7]

8.    Diamond had a subcontract with CMC, under which Diamond was to dredge the top cover off of the Tennessee Pipe with a clamshell dredge, to facilitate the work of CMC and others in lowering the Tennessee Pipe.[8]

9.    To perform the dredging operation, the DS 9 had to be moored over the Tennessee Pipe.[9]

---

[5] Central Gulf Third-Party Complaint, ¶ 2.

[6] Diamond Third-Party Complaint, ¶ 4; Central Gulf Third-Party Complaint, ¶ 4.

[7] Bergeron Deposition, Attachment 1, pp. 10-13.

[8] Pierre Deposition, Attachment 2, pp.19-21.

[9] Id. at pp. 28-29.

10.    The DS 9 was rigged with spuds, tubular pieces of steel fixed to the ends of the barge in collars, which permitted them to be lowered or raised as desired by the dredge captain.  The spuds were heavy steel, and when lowered would bury themselves in the bottom, thus serving to secure the dredge in one place.  With two spuds down, the barge was unable to move, making it a secure platform for dredging.[10]

11.    The procedure of the DS 9 for getting into position over the Tennessee Pipe was to approach the location where it had to dredge, and drop one spud to hold the dredge in the general vicinity of the Tennessee Pipe.  Thereafter, with the help of a tugboat and its boom and bucket, coupled with raising and lowering of its spuds, the dredge could maneuver itself into proper position directly over the Tennessee Pipe.[11]

12.    Tennessee Gas claims that the damage to its pipe by the DS 9 occurred as the dredge was first approaching the pipeline and dropped a single spud to hold it in position, from which it could then be maneuvered directly over the Tennessee Pipe.[12]

13.    Tennessee Gas alleges that the damage was done when the DS 9 dropped its spud on, or close to the Tennessee Pipe, whence a strong current dragged it into the pipe with great force.[13]

---

[10] Pierre Deposition, Attachment 2, pp. 47-48.

[11] Pierre Deposition, Attachment 2, pp. 32-34.

[12] Bergeron Deposition, Attachment 1, pp. 70-71.

[13] Id.

4

14.    Prior to the casualty, the DS 9 had been moored — spudded down — 800' or 1000' up-current and northerly from the Tennessee Pipe.[14]

15.    When the DS 9 lifted its spuds to move over the Tennessee Pipe, there was a very strong current, estimated by the dredge captain and another witness at 10 kts., running from where the dredge was spudded down directly toward the Tennessee Pipe.[15]

16.    When the DS 9 lifted its spuds, it was made up to the *Vivian*, which was to help the DS 9 get in position over the Tennessee Pipe.[16]

17.    The spuds were lifted on the command of the captain of the DS 9, and the movements of the DS 9, and of the *Vivian* in aid of the DS 9, were under the sole direction of the captain of the DS 9.[17]

18.    As the DS 9 approached the Tennessee Pipe, to its starboard (right) the water became shallower, and the Tennessee Pipe was marked by buoys tied to it in the deeper water close to the barge, and in the shallower water, by flagged poles stuck into the

---

[14] Pierre Deposition, Attachment 2, p. 44.

[15] Bergeron Deposition, Attachment 1, p. 42; Pierre Deposition, Attachment 2, p. 111.

[16] Pierre Deposition, Attachment 2, pp. 32-33.

[17] Pierre Deposition, Attachment 2, pp. 184-85.

5

bottom over the Tennessee Pipe; to the port (left), the Tennessee Pipe was marked by buoys tied to the pipe.[18]

19.    **The locations of the poles and buoys, and the location of the damage to the Tennessee Pipe were surveyed, and marked on the TBS map attached to the Martinez Affidavit.[19]**

20.    **By admission of the captain of the DS 9, the decision of where and when to drop the spud was entirely with him, the captain of the DS 9.[20]**

21.    **The captain of the DS 9 relied only on the line of fourteen or more buoys marking the pipeline in deciding when and where it was safe to drop the spud so as not to hit the pipeline.[21]**

22.    **The buoys marking the pipeline, with the possible exception of one buoy discussed below, were not placed by TBS personnel, but had been tied to the pipeline by divers hired by CMC.[22]**

---

[18] Pierre Deposition, Attachment 2, pp. 132-34; Guidry Deposition, Attachment 6 to this Statement, p. 66; Bergeron Deposition, Attachment 1, p. 61.

[19] Affidavit of Martinez, Attachment 5 to this Statement, ¶¶ 2-3 and attached TBS map; Affidavit of Guidry, Attachment 3 to this Statement, ¶¶ 4 & 6.

[20] Pierre Deposition, Attachment 2, pp. 48-50.

[21] Id.; TBS Map attached to Affidavit of Martinez.

[22] Bergeron Deposition, Attachment 1, pp. 24, 60-61, 133; Affidavit of Guidry, Attachment 3, ¶¶ 2 & 4; Affidavit of Dupre, Attachment 4 to this Statement, ¶¶ 4 & 6.

6

23.    A TBS employee placed a single weighted buoy at the line on November 29, 1999, more than two weeks before the accident, to mark the pipeline temporarily to help divers locate the pipeline to tie permanent buoys to the pipeline.  Thereafter divers placed the numerous buoys described above.  There is no evidence that (a) the buoy TBS placed on November 29 was still over the pipeline on December 14, when the accident occurred; or (b) that if it was still over the pipeline, the buoy placed by the TBS employee was erroneously placed; or (c) that if the buoy was still there, the dredge captain even looked at it, as it was several hundred feet from the dredge, and there were several buoys in-between.[23]

Respectfully submitted,

CHARLES F. SEEMANN, JR. (11912)
KEITH J. BERGERON (25574)
DEUTSCH, KERRIGAN & STILES, LLP
755 Magazine Street
New Orleans, Louisiana  70130
Telephone:  (504) 581-5141
Fax:  (504) 566-1201
Attorneys for Third-Party Defendant,
T. Baker Smith & Son, Inc.

---

[23] Affidavit of Guidry, Attachment 3, ¶¶ 2 & 6.  Guidry established the single buoy to be placed by GPS measurement.  Guidry Deposition, Attachment 6, pp. 36-37.  The location of that buoy and two others on the pipe on November 29, 1999, are shown on the Map attached to the Martinez Affidavit.

7

## CERTIFICATE OF SERVICE

I hereby certify that on the _10th_ day of April, 2001, a copy of [a] the TBS Motion

for Summary Judgment; [b] the Statement of Uncontested Material Facts in support

thereof; [c] the Memorandum in support thereof; and [d] the Notice of the Motion for

Hearing were all served by hand to Messrs. Acomb and Cohn and by mailing same, United

States mail, postage prepaid, properly addressed, to the remaining counsel of record:

Robert B. Acomb, III, Esq.
McAlpine, Peuler & Cozad
701 S. Peters St., Suite 300
New Orleans, LA 70130

Grady S. Hurley, Esq.
Jones, Walker, Waechter,
   Poitevent, Carrere & Denegre
Place St. Charles
201 St. Charles Ave., 50th Floor
New Orleans, LA 70170-5100

Stanley J. Cohn, Esq.
Lugenbuhl, Burke, Wheaton, Peck,
   Rankin & Hubbard
601 Poydras St., Suite 2775
New Orleans, LA 70130

Lawrence R. Plunkett, Jr., Esq.
Reich, Meeks & Treadaway
Two Lakeway Center
3850 N. Causeway Blvd., Suite 1000
Metairie, LA 70002

John Daniel Rayburn, Esq.
Leonard & Leonard, Ltd.
P. O. Box 91823
Lafayette, LA 70509-1823

David A. Hilleren, Esq.
Hilleren & Hilleren
P. O. Box 1750
Covington, LA 70434-1750

Timothy F. Burr, Esq.
Galloway, Johnson, Tompkins & Burr
One Shell Square
701 Poydras St., Suite 4040
New Orleans, LA 70139

KEITH J. BERGERON

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN THE MATTER OF THE COMPLAINT OF          C.A. No. 00-0156
DIAMOND SERVICES CORPORATION,
ON BEHALF OF THE DIAMOND DREDGE NO. 9      SECTION: "L" (3)
FOR EXONERATION FROM OR
LIMITATION OF LIABILITY

**********************************************************************

JOSEPH FORET, JR.                          C.A. No. 00-0708

v.                                         SECTION: "L" (3)

CENTRAL GULF TOWING, INC.

**********************************************************************

IN THE MATTER OF CENTRAL GULF TOWING, INC.,   C.A. No. 00-1166
AS OWNER *PRO HAC VICE* OF THE M/V VIVIAN,
PRAYING FOR EXONERATION FROM AND/OR           SECTION: "L" (3)
LIMITATION OF LIABILITY

**********************************************************************
NOTICE OF MOTION

To:    Robert B. Acomb, III, Esq.
       McAlpine, Peuler & Cozad
       701 S. Peters St., Suite 300
       New Orleans, LA  70130

       Stanley J. Cohn, Esq.
       Lugenbuhl, Burke, Wheaton, Peck,
         Rankin & Hubbard
       601 Poydras St., Suite 2775
       New Orleans, LA  70130

3

Attorneys for the above named Third-Party Plaintiffs, Diamond Services Corp. and Central Gulf Towing, Inc., respectively:

Please be advised that the undersigned will bring the above Motion for Summary Judgment for hearing before this Court at Room C-468, United States Court House, 500 Camp St., on the 25th day of April, 2001, at 9:00 a.m., or as soon thereafter as counsel can be heard.

CHARLES F. SEEMANN, JR (11912)
KEITH J. BERGERON (25574)
of
Deutsch, Kerrigan & Stiles, L.L.P.
755 Magazine Street
New Orleans, Louisiana 70130
Telephone: (504) 581-5141
Fax: (504) 566-1201
Attorneys for Third-Party Defendant,
T. Baker Smith & Son, Inc.

4

## CERTIFICATE OF SERVICE

I hereby certify that on the _10th_ day of April, 2001, a copy of [a] the TBS Motion for Summary Judgment; [b] the Statement of Uncontested Material Facts in support thereof; [c] the Memorandum in support thereof; and [d] the Notice of the Motion for Hearing were all served by hand to Messrs. Acomb and Cohn and by mailing same, United States mail, postage prepaid, properly addressed, to the remaining counsel of record:

Robert B. Acomb, III, Esq.
McAlpine, Peuler & Cozad
701 S. Peters St., Suite 300
New Orleans, LA 70130

Grady S. Hurley, Esq.
Jones, Walker, Waechter,
   Poitevent, Carrere & Denegre
Place St. Charles
201 St. Charles Ave., 50th Floor
New Orleans, LA 70170-5100

Stanley J. Cohn, Esq.
Lugenbuhl, Burke, Wheaton, Peck,
   Rankin & Hubbard
601 Poydras St., Suite 2775
New Orleans, LA 70130

Lawrence R. Plunkett, Jr., Esq.
Reich, Meeks & Treadaway
Two Lakeway Center
3850 N. Causeway Blvd., Suite 1000
Metairie, LA 70002

John Daniel Rayburn, Esq.
Leonard & Leonard, Ltd.
P. O. Box 91823
Lafayette, LA 70509-1823

David A. Hilleren, Esq.
Hilleren & Hilleren
P. O. Box 1750
Covington, LA 70434-1750

Timothy F. Burr, Esq.
Galloway, Johnson, Tompkins & Burr
One Shell Square
701 Poydras St., Suite 4040
New Orleans, LA 70139

G:\HUFF\CFS\10320\1032\PLD\MO-SUM~1 WPD

KEITH J. BERGERON

5

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

IN THE MATTER OF THE COMPLAINT OF          C.A. No. 00-0156
DIAMOND SERVICES CORPORATION,
ON BEHALF OF THE DIAMOND DREDGE NO. 9      SECTION: "L" (3)
FOR EXONERATION FROM OR
LIMITATION OF LIABILITY

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

JOSEPH FORET, JR.                          C.A. No. 00-0708

v.                                         SECTION: "L" (3)

CENTRAL GULF TOWING, INC.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

IN THE MATTER OF CENTRAL GULF TOWING, INC.,   C.A. No. 00-1166
AS OWNER *PRO HAC VICE* OF THE M/V VIVIAN,
PRAYING FOR EXONERATION FROM AND/OR        SECTION: "L" (3)
LIMITATION OF LIABILITY

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### MEMORANDUM IN SUPPORT OF T. BAKER SMITH & SON, INC.'S MOTION FOR SUMMARY JUDGMENT AGAINST THIRD-PARTY DEMANDS OF <u>DIAMOND SERVICES CORPORATION AND CENTRAL GULF TOWING, INC.</u>

**May It Please the Court:**

## STATEMENT OF FACTS

The underlying suit is a claim against Diamond Services Corporation (Diamond) to force Diamond to pay for damages caused to the Tennessee Gas Pipeline in Quatre Bayou Pass, when the Diamond Dredge No. 9 (DS 9) dropped a spud on it.[1]  Diamond (and later Central Gulf Towing whose tugboat was assisting the dredge) filed  Third-Party Complaints against T. Baker Smith & Son, Inc. (TBS), alleging that the reason the captain dropped a spud on the Tennessee Gas line was that TBS had "mis-marked" the line.[2]

In depositions Diamond's dredge captain admitted to having complete control of when and where to activate the switch to drop the spud;[3] and he testified that in deciding when he could drop it and not hit the line, he relied only on a line of buoys marking the pipeline.  Diamond claims the buoys improperly marked the line, and that TBS placed the buoys.  The grounds for TBS' Motion for Summary Judgment is simple:  the line of buoys, on which the dredge captain admittedly relied, was not placed by TBS personnel, but by others.

The casualty occurred on December 14, 1999, but the train of events began in October.  Tennessee Gas learned then that several hundred feet of the pipeline which

---

[1] Statements of Uncontested Material Facts ¶¶ 1-2.

[2] Statements of Uncontested Material Facts ¶¶ 3, 5-6.

[3] Statement of Uncontested Material Facts ¶ 17.

2

should have been buried several feet under the bottom of Quatre Bayou Pass, was not only uncovered, but that the bottom has washed away.  The pipeline for a length of 150 feet was suspended unsupported, a violation of federal regulations controlling the pipeline. Tennessee Gas hired Chet Morrison Contractor, Inc. (CMC) to "lower" the pipeline by dredging a deep trench alongside the pipeline, and then pulling the pipeline into it, so that it could then be covered with soil.[4]

Tennessee Gas hired TBS, a surveying company, to make various measurements of where the pipe was uncovered and suspended, so that Tennessee Gas could plan the repair.  The affidavits show that from November 19, 1999 to the casualty, only two TBS crews were at the Tennessee line.  On November 19, the first of the two TBS crews led by Harry Dupre (Dupre) marked portions of the pipeline with cane poles in shallow water, and probed to find out exactly where the pipe was uncovered and where it was suspended. **Dupre's affidavit shows that there were no buoys marking the pipeline when his crew arrived  on November 19, 1999, and that he and his crew placed no buoys ever on the Tennessee Gas pipeline.**  However, some third parties did place buoys on the line while Dupre was working there.

The water in Quatre Bayou Pass where the pipeline was suspended is too deep, with tidal currents too severe, to mark the pipeline with cane poles.   TBS personnel

---

[4] Statements of Uncontested Material Facts ¶¶ 7-8.

recommended that Tennessee Gas hire divers from other companies to tie the buoys to the pipeline to mark it, and Tennessee Gas project manager Donny Bergeron agreed.

Bergeron testified that Tennessee Gas hired others, not TBS, to have divers tie buoys to the Tennessee Gas pipeline; and that TBS did not place buoys to mark the line.[5] He testified without reservation that TBS personnel were not hired or paid to put out buoys to mark the pipe in deep water and that TBS personnel did not.[6]  Bergeron's testimony was equally clear that divers from other companies tied the buoys to the pipeline.[7]

The second TBS crew, led by Gary Guidry, first went to the pipeline on November 29, 1999, more than two weeks before the accident.   That day there were already two buoys, which Guidry believed were placed by divers, marking the pipeline in deep water.[8] **On November 29, solely to aid divers working to find the pipe to tie buoys to it, Guidry added a single buoy in deep water near the two buoys that were already there,** and using Global Positioning Equipment accurate to within 1.5 feet, recorded the precise latitude and longitude of each of the buoys in place at the time.[9]

---

[5] Bergeron Deposition, Attachment 1, pp. 57-60 & 132-33.

[6] Bergeron Deposition, Attachment 1, pp. 59-60 & 132-134.

[7] Id.

[8] Affidavit of Guidry, Attachment 3, ¶¶ 2 & 4; Guidry Deposition, Attachment 6, pp. 17-18 & 20-22; Guidry Deposition Exhibit 2, Bates Stamped TBS-0197.

[9] Affidavit of Guidry, Attachment 3, ¶ 4; Guidry Deposition, Attachment 6, pp. 20-22, 46, 76-77 & 102-104; Guidry Deposition Exhibit 2, Bates Stamped TBS-0197 through TBS-0198.

4

**After November 29th, Guidry and his crew did not place another buoy;** but, numerous buoys were placed on the pipeline by others, presumably by divers hired by CMC or Tennessee Gas, but not by TBS.[10] And in the three or four days before the casualty, Guidry went by boat to each of the buoys and cane poles marking the pipeline and, with his GPS equipment, took the precise latitude and longitude of each, which he recorded in his field book.[11] The buoys and poles that Guidry thus recorded were the ones in place on the day of the casualty.[12] Guidry's field book was later turned over to the TBS mapping department, which produced the map attached to the Affidavit of Martinez, which shows with accuracy and to scale, the locations of buoys and cane poles marking the pipeline on the day of the casualty; it also marks with "small X's" the location of the three buoys in place on November 29.[13]

The night of December 13-14, 1999, the DS 9, spudded down 800' or so north of the Tennessee Gas Pipeline made up to the tugboat *Vivian.*[14] To perform its services, the DS 9 had to straddle the pipeline in deeper water and then kedge along the pipeline with

---

[10] Statements of Uncontested Material Facts ¶¶ 22-23.

[11] Affidavit of Guidry, Attachment 3, ¶ 6.

[12] Guidry Deposition, Attachment 6, pp. 188-90.

[13] Statement of Uncontested Material Facts ¶ 19; Map attached to Affidavit of Martinez.

[14] Statement of Uncontested Material Facts ¶ 14.

its boom and bucket to the shallower water where it would begin removing the cover over the pipe with a clamshell dredge bucket from east to west.[15]

Louis Pierre, the DS 9 captain, testified that there was a very strong current running out, which he estimated at ten knots.[16] After the *Vivian* was secured to the DS 9, the captain lifted his spuds, and the DS 9 and the *Vivian*, in the grip of the current, began to descend upon the pipeline.[17] Pierre intended to drop a single spud shortly before the DS 9 passed over the pipeline to stop the tug just up-current from the pipeline;[18] from that point, he intended to jockey the DS 9, with the *Vivian's* help, into position straddling the pipeline.[19] Thereafter he would drop the other spud, once there, he intended to align the DS 9 over the pipeline, using his boom and bucket to kedge from east to west to the Station where he had to begin dredging.[20]

---

[15] Pierre Deposition, Attachment 2, pp.130; 141-42. Kedge is defined as navigating a vessel without power, but by some other mechanical method, such as repeatedly winching to an anchor dropped away from the vessel. In this context, the dredge bucket could be dropped away, and the dredge pulled to it by the winch, a type of kedging.

[16] Pierre Deposition, Attachment 2, p. 37; Statement of Uncontested Material Facts ¶ 15.

[17] Pierre Deposition, Attachment 2, pp. 44-45; Statements of Uncontested Material Facts ¶¶ 4 & 16.

[18] Pierre Deposition, Attachment 2, pp. 32-33 & 155.

[19] Id. at pp. 32-33 & 159-61; Statement of Uncontested Material Facts ¶ 9.

[20] Pierre Deposition, Attachment 2, pp. 141-42; Statement of Uncontested Material Facts ¶ 11.

It is not clear whether the DS 9 dropped the spud directly onto the pipe, or whether it dropped the spud short of the pipeline, and was dragged into the pipeline by its own momentum and the current.[21]  Because Pierre denies that the DS 9 dragged the spud, for the purpose of this summary judgment, we assume that the DS 9 stopped where it dropped the spud.  And the question then is whether the captain relied on any TBS markers in deciding where to drop the spud.

In any event, Pierre testified that as he approached the pipe, he relied entirely upon the buoys marking the pipe to decide where to drop the spud.[22]  During  initial questioning by Mr. Cohn, the dredge captain responded:

> Q:     How do you know you were 15 to 20 feet from the pipeline?
> A:     Well, I could see.  I could see the buoys from where I was standing. I know I was in safe enough--my spud is 40 foot from the front, from--When I say the back of my barge, from the stern end to the back of my spud is 40 foot, and I was standing approximately half away when I was in line with the buoys.[23]

He reiterated and expanded that testimony minutes later:

---

[21] Statements of Uncontested Material Facts ¶¶ 12-13.  There is eyewitness testimony that the dredge dragged the spud into the pipeline, meaning that the cause of the accident was not because Pierre did not know where to drop the spud, but because he dropped the spud in the right place but underestimated the momentum of the dredge and the force of the current.  That issue is not relevant to this Motion; but if the DS 9 dragged its spud into the pipeline, mis-marking would be irrelevant.

[22] Statements of Uncontested Material Facts ¶¶ 20-21.

[23] Pierre Deposition, Attachment 2, p. 50.

Q:    Now, when you were looking at these buoys as you were getting on location, were you assuming that the buoys were directly on top of the pipeline or not?

A:    I figured they was three or four foot, five foot off.

Q:    When you said earlier that you were 15 to 20 feet away or at least your starboard spud was 15 to 20 feet from the pipeline when you dropped it, were you also basing that upon your assumption about where there buoys were located?

A:    Yes.

Q:    Did you look at the buoys or what did you look at before --

A:    I was standing on the deck.  I was standing right here.

Q:    What were you using as your point of reference?

A:    This right here.

Q:    The buoys?

A:    Yeah.

Q:    You were looking at the buoys?

A:    I was looking at the buoys.[24]

Pierre further clarified his reliance on the line of buoys during cross-examination by Mr.

Seemann:

Q:    And if I understood correctly, at the time you gave the command to drop the spuds, drop the starboard spud, you were looking down the line of buoys?  You were guiding off of the buoys?

A:    Yes, sir.[25]

Pierre specifically acknowledged his reliance on the buoys as opposed to the cane poles

markers further west:

---

[24] Pierre Deposition, Attachment 2, pp. 54-55.

[25] Pierre Deposition, Attachment 2, p. 150.

8

Q:    When you were approaching this location, going that last 800 to 1,000 feet, were you looking at the cane poles, the buoys or both?
A:    I looked at--I was looking at the cane poles, you know, before--after I--when I dropped this spud.  But I was basically going by these.
Q:    Buoys?
A:    The buoys.[26]

The map attached to the Martinez affidavit shows that where the accident occurred, there were buoys to the port and starboard of the DS 9.[27]

Finally there is no evidence that the buoys were mis-located, or not properly tied to the pipeline.  The DS 9 departed the site the next day without any investigation.  And there is no evidence of any other showing the pipeline was mismarked.

## LAW

Under Rule 56(c), FRCP, summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[28]  Mover must affirmatively demonstrate there is no dispute over the material facts; and the non-mover must show more than some metaphysical doubt as to the material facts.[29]  The facts

---

[26] Pierre Deposition, Attachment 2, pp. 56-57.

[27] Map attached to the Affidavit of Martinez; Statement of Uncontested Material Facts ¶ 18.

[28] Anderson vs. Liberty Lobby, Inc., 477 US 242, 249-251, 106 S.Ct. 2505, 2511-2512, 91 L.Ed. 202 (1986).

[29] Matsushita Electric Industrial Co. vs. Zenith Radio Corp., 475 U.S. 574, 585-587, 585 n.10, 106 S.Ct. 1348, 1355-1356, 1355 n.10 (1986).

are viewed in the light most favorable to the parties opposing the motion and the court indulges reasonable inferences from the facts in favor of the non-mover;[30] but, summary judgment must be granted if there is no genuine issue of fact and the mover is entitled to judgment on the legal issues.[31]

The Supreme Court has held that Rule 56 mandates entry of summary judgment, after adequate time for discovery has passed, and against any party which fails to make a showing sufficient to establish an essential element of its case and on which that party will bear the burden of proof.[32]

If the mover meets its burden, then the non-mover <u>must</u> go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial.[33]  The non-mover's burden is <u>not</u> satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.[34]

This standard provides that the mere existence of <u>some</u> factual dispute will not

---

[30] <u>Newport Limited vs. Sears, Roebuck & Co.</u>, 6 F.3d 1058, 1014 (5th Cir. 1993).

[31] <u>Harbor Ins. Co. vs. Trammell Crow Co., Inc.</u>, 854 F.2d 94, 98 (5th Cir. 1988), <u>cert. denied</u> 109 S.Ct. 1315 (1989); <u>Willis vs. Roche Biomedical Laboratories, Inc.</u>, 61 F.3d 313, 315 (5th Cir. 1995).

[32] <u>Celotex vs. Catrett</u>, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed 265 (1986); <u>Willis</u>, 61 F.3d at 315.

[33] <u>Celotex</u>, 477 U.S. at 325, 106 S.Ct. at 2553-54; <u>Willis</u>, 61 F.3d at 315.

[34] <u>Little vs. Liquid Air Corp.</u>, 37 F.3d 1069, 1075 (5th Cir. 1994); <u>Willis</u>, 61 F.3d at 315.

10

defeat a motion for summary judgment; Rule 56 requires that the fact dispute be <u>genuine</u> and <u>material</u>."[35]

This is a tort claim; Diamond had no contract with TBS, and there is no evidence that TBS undertook a contractual duty to tie buoys to the line for contractors' benefit. Diamond must therefore show not only breach of some duty owed Diamond, but also that TBS breached the duty, and that the breach caused the damage complained of.  If the plaintiff cannot meet his burden on any one of these factors, the negligence cause of action fails, and summary judgment is appropriate.

When performing the duty-risk analysis, the court must first determine if the alleged substandard conduct was a cause-in-fact of the accident, i.e. whether the accident would have occurred but for the defendant's conduct or (with concurrent causes) whether the defendant's conduct was a substantial factor in causing the accident.[36]  Causation is a fact-specific inquiry.[37]  If the defendant's actions had something to do with the accident, the test of a factual, causal relationship is met.[38]

---

[35] <u>Willis</u>, 61 F.3d at 315.

[36] <u>Daye v. General Motors Corp.</u>, 720 So.2d 654 (La. 1998); <u>Boykin v. Louisiana Transit Co.</u>, 707 So.2d 1225 (La. 1998).

[37] <u>Graves v. Page</u>, 703 So.2d 566 (La. 1997).

[38] <u>Stroik v. Ponseti</u>, 699 So.2d 1072 (La. 1997).

11

## ARGUMENT

If there is to be any liability for mis-marking the pipeline with buoys, third-party plaintiffs must prove that TBS placed them. The only evidence is that TBS personnel did not place them.

As set out in greater detail in the Statement of Uncontested Facts and the Affidavits, Dupre and Guidry led the only two TBS survey crews at the job site between November 19, 1999, and the time of the accident on December 14, 1999. Dupre's Affidavit shows that when he arrived on the site on November 19, there were no buoys there, and he and his crew placed none, although he was aware some buoys were placed by third parties, presumably divers, on or around November 22.

Dupre did place four cane poles to the west of the casualty site in shallow water and on the marsh island, and these cane poles were later reinforced and supplemented by Guidry.[39] As set out in the affidavits, the cane poles were placed on the pipeline by probing until the pipe was physically located. They were not mis-located.

The Affidavits of Guidry and Dupre establish that because the water was too deep and the current too swift for cane poles, Tennessee Gas agreed to have divers tie buoys to the Tennessee Gas pipeline to mark it for the work crews; and those divers were not employed by TBS.

---

[39] Affidavit of Guidry, Attachment 3, ¶ 5; Affidavit of Dupre, Attachment 4, ¶ 5.

12

When Guidry first went on the site on November 29, there were two buoys already there marking the pipeline, and he dropped a buoy secured by a weight as a temporary marker, to assist the divers who Guidry expected to tie additional buoys to mark the pipeline "permanently." Thereafter divers placed other buoys so that at least fourteen buoys marked the pipeline the day of the accident. There is no evidence whether the single buoy dropped by Guidry was there on the day of the casualty, or whether the divers removed it and replaced it with other buoys. But it is clear that Guidry dropped that buoy several hundred feet east of where the accident happened, and that divers placed a number of buoys between that location and where the accident occurred, so that there is no way to establish Pierre relied on that single buoy when there was a whole line of buoys there placed by others. All of the cane poles are depicted with green triangles on the map, but these were not the markers on which the dredge captain relied.

It is respectfully submitted that the evidence does not support any possible inference of causation based upon anything that TBS personnel did.

13

Respectfully submitted,

CHARLES F. SEEMANN, JR (11912)
KEITH J. BERGERON (25574)
                of
Deutsch, Kerrigan & Stiles, L.L.P.
755 Magazine Street
New Orleans, Louisiana 70130
Telephone:  (504) 581-5141
Fax:  (504) 566-1201
Attorneys for Third-Party Defendant,
T. Baker Smith & Son, Inc.

14

## CERTIFICATE OF SERVICE

I hereby certify that on the _10th_ day of April, 2001, a copy of [a] the TBS Motion for Summary Judgment; [b] the Statement of Uncontested Material Facts in support thereof; [c] the Memorandum in support thereof; and [d] the Notice of the Motion for Hearing were all served by hand to Messrs. Acomb and Cohn and by mailing same, United States mail, postage prepaid, properly addressed, to the remaining counsel of record:

Robert B. Acomb, III, Esq.
McAlpine, Peuler & Cozad
701 S. Peters St., Suite 300
New Orleans, LA 70130

Grady S. Hurley, Esq.
Jones, Walker, Waechter,
   Poitevent, Carrere & Denegre
Place St. Charles
201 St. Charles Ave., 50th Floor
New Orleans, LA 70170-5100

Stanley J. Cohn, Esq.
Lugenbuhl, Burke, Wheaton, Peck,
   Rankin & Hubbard
601 Poydras St., Suite 2775
New Orleans, LA 70130

Lawrence R. Plunkett, Jr., Esq.
Reich, Meeks & Treadaway
Two Lakeway Center
3850 N. Causeway Blvd., Suite 1000
Metairie, LA 70002

John Daniel Rayburn, Esq.
Leonard & Leonard, Ltd.
P. O. Box 91823
Lafayette, LA 70509-1823

David A. Hilleren, Esq.
Hilleren & Hilleren
P. O. Box 1750
Covington, LA 70434-1750

Timothy F. Burr, Esq.
Galloway, Johnson, Tompkins & Burr
One Shell Square
701 Poydras St., Suite 4040
New Orleans, LA 70139

G:\HUFF\CFS\10320\1032\PLD\ME-SUM~1.WPD

KEITH J. BERGERON

15

# SEE RECORD FOR
# EXHIBITS
# OR
# ATTACHMENTS
# NOT SCANNED