FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2001 APR 20 PM 4:31

LORETTA G. WHYTE
CLERK

55494/RBA/bcb                                                               0265-5765

## UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN THE MATTER OF THE COMPLAINT OF DIAMOND SERVICES CORPORATION, ON BEHALF OF THE DIAMOND DREDGE NO. 9 FOR EXONERATION FROM OR LIMITATION OF LIABILITY | CIVIL ACTION<br><br>NUMBER: 00-0156<br><br>SECTION: "L" (3) |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

| | |
|---|---|
| JOSEPH FORET, JR. | CIVIL ACTION |
| VERSUS | NO.: 00-0708 |
| CENTRAL GULF TOWING, INC. | SECTION: "L" (3) |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

| | |
|---|---|
| IN THE MATTER OF CENTRAL GULF TOWING, INC., AS OWNER *PRO HAC VICE* OF THE M/V VIVIAN, PRAYING FOR EXONERATION FROM AND/OR LIMITATION OF LIABILITY | CIVIL ACTION<br><br>NUMBER: 00-1166<br><br>SECTION: "L" (3) |

### DIAMOND SERVICE CORPORATION AND CENTRAL GULF TOWING INC.'S MEMORANDUM IN OPPOSITION TO T. BAKER SMITH & SON, INC.'S MOTION FOR SUMMARY JUDGMENT

MAY IT PLEASE THE COURT:

This Memorandum is submitted on behalf of third-party plaintiffs, Diamond Services Corporation and Central Gulf Towing, Inc., (hereinafter referred to collectively as "Diamond Services") in opposition to third-party defendant, T. Baker Smith & Son, Inc.'s ("TBS") Motion for Summary Judgment.

## BACKGROUND

This matter involves actions for exoneration from and/or limitation of liability filed by Diamond Services and Central Gulf arising out of alleged spud damage to an undersea pipeline owned by Tennessee Gas Pipeline ("TGP") in December, 1999. T. Baker Smith & Son, Inc.'s surveyors located and surveyed the TGP 24 inch undersea buried pipeline in Quatre Bayou Pass identifying and marking portions of the pipeline which were exposed due to erosion.

TGP contracted with Chet Morrison Contractors, Inc., ("CMC") to re-bury the pipeline. CMC began operations to lower the pipeline in November, 1999, using a TYO pump and divers to jet a trench and lower the pipe. Due to difficulties encountered due to the adverse working conditions, CMC contracted with Diamond Services for use of the Diamond Dredge No. 9 to strip cover off the buried portions of the pipeline by dredging a 50 foot by 200 foot channel, 25 feet on either side of the pipeline, then divers jetted a trench and lowered the pipe into it.

TGP and CMC claim that the Diamond dredge No. 9's spud contacted the pipeline as it was maneuvering into position to straddle the line.

Obviously, since the pipeline was underwater there was no way for the dredge Captain to locate the pipeline other than to rely on markings placed by TBS surveyors with cane poles in the shallows, and divers, who marked the pipeline in deeper waters with buoys attached to the pipeline with rope, which the Captain of the dredge has testified he later observed were inaccurate and offline.

## FACTS

During the early morning hours of December 14, 1999, the Diamond Dredge No. 9 arrived on location. The captain of the dredge met with the TGP inspector, Bergeron, the CMC inspector, Falgout, and TBS surveyor, Guidry.[1] At this meeting, the dredge Captain Pierre confirmed the buoys and cane poles accurately marked the location of the pipeline, and was provided with TBS computer generated charts, maps or diagrams depicting the location of the pipeline.[2] When the surveyor, Guidry was questioned he testified as follows:

>    Q:    Do you know if the Captain of the dredge had any of your maps when he was maneuvering over the pipeline on December 14, 1999?

---

[1] Deposition of Captain Pierre at pages 175-76; Deposition of Bergeron at pages 109-110; Deposition of Guidry at pages 109-111, 118-119, 196.

[2] Deposition of Guidry at pages 101-112, 223.

- 3 -

A: The only one I knew he had was one that I had that I have -- we wrote before the dredge went on to location, I wrote out a map that was reproduced that showed the actual depth of the pipe where he was going to be dredging. . .

Q: That is another meeting other than the other two that you just had?

A: Well, it's not really a meeting. It's just getting together and discussing on how you -- what he was there to do. . .

Q: Do you know which one it is?

A: I don't know if its here, but if I see it, I could tell you if that is the one. . . It probably -- I don't know if it was a certified map that was produced, and I showed -- I did show it to Donny, Donny Bergeron and (Captain) Mr. Lewis. Of course he had to know how deep he was going to dredge over this pipeline. **And that is part of the reason that we showed him that map. We didn't want him to hit the pipeline.**

Q: Was it a hand-drawn map?

A: No, it was computer drawn.[3]

No warning was given to the dredge captain the pipeline markings could be off position as a result of the wave action, the 10 mph current, and low tide despite the fact the surveyor knew this and was concerned about the dredge hitting the pipeline.[4]

---

[3] **Deposition of Guidry at pages 110-113.**

[4] **Deposition of Guidry at pages 196-197.**

At this meeting, Guidry showed Captain Pierre where the pipeline was located, how it was marked, and told him the areas that needed to be dredged, then he flagged the area where the dredging was to start, with a pink flag or blue flagging.[5]

Furthermore, the dredge Captain used as reference the cane poles and buoys dropped by TBS and the divers, to locate the submerged pipeline.  TBS admits it marked the pipeline with cane poles.  The dredge Captain testified the cane poles and buoys **did not line up,** which creates a factual issue precluding TBS' summary judgment.

There is no question the captain of the dredge navigated the dredge using a reference line of the cane poles and buoys to ascertain the location of the submerged pipeline:

> "Q.  When you said earlier that you were 15 to 20 feet away or at least your starboard spud was 15 to 20 feet from the pipeline when you dropped it, were you also basing that upon your assumption about where these buoys were located?
>
> A.  Yes.
>
> Q.  Did you look at the buoys or what did you look at before -
>
> A.  I was standing on the deck.  I was standing right here.
>
> Q.  What were you using as your point of reference?
>
> A.  This right here.
>
> Q.  The buoys?
>
> A.  Yea.

---

[5] Deposition of Guidry at page 118-119.

- 5 -

> Q. You were looking at the buoys?
>
> A. I was looking at the buoys.
>
> **Q. Were you looking at the cane poles?**
>
> **A. Yes, sir. I was looking at the cane poles.**
>
> Q. Were the cane poles directly in line with the buoys or -
>
> A. No. No. **The cane poles and buoys didn't match up."** *Deposition of Captain Louis Pierre at pp. 54-55.*

Captain Pierre lined up his dredge and dropped his spud after using the cane poles and buoys, he was surprised to discover the cone poles and buoys did not line up:

> "Q. When you were approaching this location, going that last 800 to 1000 feet, were you looking at the cane poles, the buoys or both?
>
> A. I looked at - I was looking at the cane poles, you know, before that - after I - when I dropped the spud. But I was basically going by these
>
> Q. Buoys?
>
> A. The buoys.
>
> Q. Before you dropped your starboard spud, did you also look at the cane poles?
>
> A. Yea...
>
> **Q. When did you later see a discrepancy between the cane poles and the buoys? When did you first realize that?**

- 6 -

> A. After I was set up and dredging, my operator was set up and beginning to strip this line. I would go out on every move and when we moved, we moved probably ten foot at a time...at this time, all I had to go by was by the cane poles."[6]

Diamond Services submits that TBS was aware of the problem with the buoys marking the line as TBS recorded the geographical position of each of the buoy and cane poles marking the line to generate their maps. The TBS surveyor testified:

Q: And you are aware of the problems with the buoys on that pipeline?

A: Meaning --

Q: Did the current affect the buoys on the pipeline?

A: Sometimes when the current is running strong, it will push the buoys over a little bit. And that is -- sometimes they, if the tide does come up, they will submerge them sometimes.[7]

TBS did not warn the dredge Captain that these buoys and cone poles were offline. Captain Pierre attempted to account for this misalignment, but was instructed that the markings were accurate. Further compounding this problem was the fact TBS used the same white Styrofoam buoys the divers did, and even the TBS surveyor admitted there

---

[6] Deposition of Captain Pierre at pages 56-58.

[7] Deposition of Guidry at page 84.

- 7 -

was so many buoys floating around, and submerged, it was difficult to tell which buoy belonged to whom.[8]

## ARGUMENT AND LAW

TBS was hired by TGP to locate, survey and mark the submerged TGP pipeline, as well as other pipelines in the area. (Exhibit No. 1)  In discovery depositions, the TBS' surveyors testified they located the pipeline and marked the pipeline in shallow water, using cane poles and flags, and dropped at least one weighted buoy on the TGP pipeline.

The TBS weighted buoy was never retrieved and negligently left to drift off position.[9] TBS also admits it marked other pipelines in the area using these same buoys attached to weights, which drifted after being undermined by the strong current.[10]

The TBS surveyor, Gary J. Guidry, met with Captain Louis Pierre, the Diamond Dredge No. 9, before dredging operations started, and showed him charts and diagram of the area and the location of the submerged pipeline.  Despite TBS' assertions to the contrary, TBS was intricately involved with ascertaining the correct location and marking the pipeline:

---

[8] Deposition of Guidry at page 201 & 236.

[9] Deposition of Donald Bergeron at pages 56-57.

[10] Deposition of Guidry at pages 148-149.

1. TBS was the only surveyors charged with locating the line, and monitored the marking of the line at the job site during CMC's lowering of the pipeline.[11]

2. TBS located and dropped a buoy tied to a weight, which the surveyor knew would float off the line sometime prior to the dredging operations.[12]

3. TBS located and marked other lines in the area using these same weighted buoys, and cane poles, knowing full well that the buoys would float off the line.[13]

4. TBS also set tidal gauges to record the variations and tides, which information was not provided to the captain of the Dredge No. 9 before dredging operations began.[14]

5. TBS probed and set cane poles with flags in the shallow end, and made a judgment as to where the pipeline was between the cane poles and the buoys, which were allegedly set by divers and tied to the pipeline.[15]

6. The TBS surveyor admitted that he took latitude and longitude markings and GPS readings of buoys and cane poles marking the pipeline before dredging operations began.[16]

---

[11] Exhibit No. 1.

[12] Deposition of Guidry at pages 144, 148, 150

[13] Deposition of Guidry at pages 46-47.

[14] Depositon of Guidry at page 85, Deposition of Pierre at page 204.

[15] Deposition of Guidry at page 164.

[16] Deposition of Guidry at page 77.

7. This geographical information was collected by TBS, and used by TBS's office to generate maps and charts depicting the markings on the pipeline, which was used during the job to replace the cane poles and buoys, which were lost due to current, tide, or the operations to lower the pipeline.[17]

8. TBS surveyors also recorded the pneumo gauge readings and positions of each buoy given by the divers.[18]

9. TBS then generated graphs, charts and plots of the location of the pipeline[19];

10. The TBS surveyor then met with Captain Pierre, the captain of the dredge before dredging operations begun, and showed him the location of the submerged pipeline, and the area that needed to be dredged.[20]

11. The TBS surveyor did not inform Captain Pierre the buoys marking the pipeline were out of alignment, and off position due to the current, waves, and tidal forces; a fact which should have been obvious to TBS as they used their survey equipment to plot the geographical location, longitude and latitude position of the cane poles and buoys marking the pipeline.[21]

---

[17] Deposition of Guidry at pages 64-69.

[18] Deposition of Guidry at pages 64-69, 104.

[19] Deposition of Guidry at pages 77.

[20] Deposition of Guidry at pages 110-116; Deposition of Pierre at pages 175-176.

[21] Depsoition of Guidry at pages 110-113, 115-118.

TBS would have the Court believe that they had nothing to do with marking and/or insuring the accuracy of these markings on this pipeline, despite the fact TBS surveyors took GPS, geographical latitude and longitude, depth readings of all the markings on the line, located the pipe and generated charts and maps showing the position of the pipeline, which were used to give the dredge Captain instructions on where to dredge.

The captain of the Dredge No. 9 was adamant in his testimony that his spud would not have come into contact with the pipeline if the markings on the pipeline were in line, as he was so informed.

The area depicted on the TBS drawing, an excerpt is attached as Exhibit No. 2, clearly shows the area of the alleged spud contact was near the reference line created by the cane poles and the buoys. Captain Pierre was only able to judge where the line was located based on either the cane poles or the buoys, depending on where his dredge was during the maneuver to straddle the line.

## **LAW**

Summary judgment should be granted only if "there is no issue as to a material fact and the moving parties found judgment as a matter of law". *Rule 56(c) of Federal Rules of Civil Procedure*. The party seeking summary judgment bears the initial burden to show the District Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Once the moving party is satisfied, the burden shifts to

the non-moving party to show the existence of a genuine issue of material fact. If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex Corp. v. Catarett*, 477 U.S. 317, 322 (1986). The function of the Court is not to "waive the evidence and determine the truth of the matter, but to determine whether there is an issue for trial". *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The evidence must be viewed in a light most favorable to the non-moving party and all inferences will be drawn in a non-moving parties favor. *Id*. at 255; *Matusushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Cress & Co.*, 398 U.S. 144, 157-159 (1970).

Applying these standards, Diamond Services submits there remains factual issues to be decided at trial as to TBS' negligence in marking the pipeline, the accuracy of the information given to the captain of the dredge, and responsibility for warning the Captain that the markings were offline.

TBS points the finger at the divers, but in fact, TBS was the only surveyors on this job collecting the location of each buoy and cane pole, the depth of the water, and generating maps, charts and diagrams of the location and depth of the pipeline as well as those maps, which were provided to Captain Pierre. No warning was given as to the effect of the tides and current on the accuracy of the markings.

## CONCLUSION

For the foregoing reasons, Diamond Services Corporation and Central Gulf Towing, Inc., submits that T. Baker Smith & Son, Inc.'s Motion for Summary Judgment should be denied on grounds there are material factual issues in dispute, and TBS is not entitled to summary judgment as a matter of law.

_____
MICHAEL L. McALPINE, T.A. (#9195)
RICHARD A. COZAD (#4537)
ROBERT B. ACOMB, III (#2303)
McALPINE & COZAD
701 South Peters St., Suite 300
New Orleans, LA 70130
Telephone: (504) 561-0323; Fax: 528-9442
Attorneys for Diamond Services Corporation

*CERTIFICATE OF SERVICE*

I do hereby certify that I have on April 20, 2001, served a copy of the foregoing pleading on counsel for all parties to this proceeding by mailing and faxing same by United States mail, properly addressed and first class postage prepaid.

_____

55492/RBA/bcb                                                                    0265-5765

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN THE MATTER OF THE COMPLAINT<br>OF DIAMOND SERVICES CORPORATION,<br>ON BEHALF OF THE DIAMOND DREDGE<br>NO. 9 FOR EXONERATION FROM OR<br>LIMITATION OF LIABILITY | CIVIL ACTION<br><br>NUMBER: 00-0156<br><br>SECTION: "L" (3) |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

| | |
|---|---|
| JOSEPH FORET, JR. | CIVIL ACTION |
| VERSUS | NO.: 00-0708 |
| CENTRAL GULF TOWING, INC. | SECTION: "L" (3) |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

| | |
|---|---|
| IN THE MATTER OF CENTRAL GULF<br>TOWING, INC., AS OWNER *PRO HAC*<br>*VICE* OF THE M/V VIVIAN, PRAYING<br>FOR EXONERATION FROM AND/OR<br>LIMITATION OF LIABILITY | CIVIL ACTION<br><br>NUMBER: 00-1166<br><br>SECTION: "L" (3) |

## RESPONSES TO T. BAKER SMITH & SON, INC.'S
## STATEMENT OF UNCONTESTED MATERIAL FACTS

NOW INTO COURT, through undersigned counsel, comes Diamond Services

Corporation, and Central Gulf Towing, Inc., (hereinafter "Diamond Services") who

responds to T. Baker Smith & Son, Inc.'s Statement of Uncontested Material Facts as follows:

1. Contested as written. This is a suit for exoneration from and/or limitation of liability filed by Diamond Services Corporation, and Central Gulf Towing, Inc. Tennessee Gas Pipeline Company and Chet Morrison Contractors, Inc. have filed claims for the cost of repairing damage to the 24 inch gas pipeline, which they allege was caused by Diamond's Dredge No. 9. Diamond Services and Central Gulf deny liability but alternatively allege if this Court finds the dredge caused the alleged damage to the pipeline, then Diamond Services and Central Gulf were without privity or knowledge, and the pipeline was improperly marked.

2. Contested as written. TGP and CMC allege the Dredge No. 9's spud slid into contact with the submerged pipeline on December 14, 1999.

3. Contested as written. Diamond Services and Central Gulf contend employees of T. Baker Smith & Son, Inc. (TBS) met with Captain Pierre before dredging began, reviewed with Captain Pierre charts and diagrams denoting the longitude and latitude of the buoys and cone poles marking the position and depth of the submerged pipeline, but did not provide Captain Pierre with tidal gauge readings, as well as information the buoys marking the pipeline moved off position by as much as three to five feet as a result of the tides and current in the area. *Deposition of Captain Louis Pierre at pp. 38-42, 55-57, 72-73, 91-92, 117, 178-179, 182-184; Deposition of Gary J. Guidry at pp. 36, 46-47, 64, 69, 77, 80-81,*

*83, 84, 90, 104-111, 118-119, 122, 142, 144, 148-149, 150, 170,190, 192, 196, 201, 202-203, 227-229, 233, 236.*

    4. Admitted.

    5. Admitted.

    6. Contested as written. Diamond Services contends TBS was negligent not only in marking the pipeline with cane poles and a weighted buoy, but in generating maps, charts and diagrams of the submerged pipeline, which were provided to Captain Louis, without any warning the charts and diagrams depicting the location of the pipeline and the markings were not properly aligned or reflected the effect of current and tides.

    7. Admitted.

    8. Admitted. Diamond Services and Central Gulf was performing work pursuant to a Master Service Contract with CMC, to work as directed.

    9. Admitted.

    10. Contested as written. The hard sandy bottom in Quatre Bayou Pass prevented the spud from sinking. The reason the dredge was hired was because the divers could not jet away the sandy cover on the pipe.

    11. Admitted.

    12. Contested. Diamond Services denies it was negligent in damaging Tennessee Gas Pipeline Co.'s pipe. Captain Pierre testified that as he was maneuvering his barge over the pipeline, he dropped the starboard spud, swung 180 degrees and dropped the port spud

to stop the forward momentum of the dredge, allowing the VIVIAN to maneuver the dredge into position to straddle the pipeline.

13. Contested. Diamond Services denies it was negligent and/or that damage was done by the Diamond Services Dredge No. 9's spud.

14. Admitted.

15. Contested as written. The Diamond Dredge No. 9 was moved into position by the VIVIAN, making a semi-circle around the moored SUSAN MORRISON and the barge CMC No. 5, at which time an allision occurred. Several minutes later, the Dredge No. 9, under the direction of Captain Pierre, was maneuvered into position over the pipeline.

18. Admitted.

19. Admitted.

20. Admitted.

21. Contested as written. The captain of the Dredge No. 9 relied upon the cane poles and buoys to ascertain the location of the submerged pipeline, as he was maneuvering his dredge into position to drop the starboard spud. *Deposition of Louis Pierre at pp. 54-55.*

22. Contested as written. Gary Guidry admitted on cross-examination that he could not recall how many weighted buoys which would have drifted off the line were placed on this job. *Deposition of Gary Guidry at pp. 83-84, 122, 144, 148, 150, 227-228.*

23. Contested as written. *Deposition of Gary Guidry at pp. 83-84, 122, 144, 148, 150, 227-228.*

_____
MICHAEL L. McALPINE, T.A. (#9195)
RICHARD A. COZAD (#4537)
ROBERT B. ACOMB, III (#2303)
McALPINE & COZAD
701 South Peters St., Suite 300
New Orleans, LA 70130
Telephone: (504) 561-0323; Fax: 528-9442
Attorneys for Diamond Services Corporation

### CERTIFICATE OF SERVICE

I do hereby certify that I have on April 20, 2001, served a copy of the foregoing pleading on counsel for all parties to this proceeding by mailing and faxing same by United States mail, properly addressed and first class postage prepaid.

_____

- 5 -

**SEE RECORD FOR EXHIBITS OR ATTACHMENTS NOT SCANNED**