UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

COPY IN CHAMBERS

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2001 MAY -7  P 12: 15

LORETTA G. WHYTE
CLERK

| | | |
|---|---|---|
| IN THE MATTER OF THE COMPLAINT OF DIAMOND SERVICES CORPORATION, ON BEHALF OF THE DIAMOND DREDGE NO. 9 FOR EXONERATION FROM OR LIMITATION OF LIABILITY | * * * * * * | CIVIL ACTION<br><br>NO. 00-0156<br><br>SECTION "L" (3) |
| ************************************** | * | |
| JOSEPH FORET, JR.<br><br>VERSUS<br><br>CENTRAL GULF TOWING, INC. | * * * * * * | CIVIL ACTION<br><br>NO. 00-0708<br><br>SECTION "L" (3) |
| ************************************** | * | |
| IN THE MATTER OF CENTRAL GULF TOWING, INC., AS OWNER <u>PRO HAC VICE</u> OF THE M/V VIVIAN, PRAYING FOR EXONERATION FROM AND/OR LIMITATION OF LIABILITY | * * * * * * * * | CIVIL ACTION<br><br>NO. 00-1166<br><br>SECTION: "L" (3)<br><br>JUDGE FALLON<br>MAG. AFRICK |

*************************************************************************

### PRE-TRIAL BRIEF SUBMITTED ON BEHALF OF COMMERCIAL UNDERWRITERS INSURANCE COMPANY ON CONTRACTUAL/INSURANCE AND INDEMNITY ISSUES

Commercial Underwriters Insurance Company (CUIC) is the CGL carrier for Chet Morrison Contractors, Inc. (CMC). The dispute at issue which this brief addresses is whether the P&I carrier for Diamond Services Contractors, Inc. (Diamond Services) must answer for the damages at issue to the Tennessee Gas pipeline before CMC is called upon to provide defense and indemnity. Diamond Services is wrong in its assertion that the indemnity is viable before Diamond Services' P&I carrier exhausts its policy limits. <u>Ogea v. Loffland Brothers, Co.</u>,

622 F.2nd 186 (5th Cir.) and <u>Tullier v. Halliburton Geophysicals Services, Inc.</u>, 81 F.3rd 522 (5th Cir. 1996) provide all the guidance necessary for this court to rule and reaffirm that a party who has entered into a contractual indemnity provision but also names the indemnitor as an additional assured under its liability policies, must first exhaust the insurance it agreed to obtain before seeking contractual indemnity.

## THE PARTIES AND HOW IT ALL BEGAN

CMC entered into an Alliance Agreement with El Paso Energy Corporation (for the purposes of this brief, El Paso Energy Corporation will be referred to as "Tennessee Gas") to bury a 24" gas pipeline. (Alliance Agreement attached as Exhibit "1") Article XII of that agreement provided for indemnity. Article XII (A) provided CMC would indemnify and hold harmless Tennessee Gas from all and every kind of character of liability, damages, losses, costs, expenses, demands, claims, suits, actions and causes of action on account of property damage to Tennessee Gas arising from any cause whatsoever growing out of or in connection with CMC's negligent performance of the work contemplated. This section of the Alliance Agreement also required CMC to agree that each of its subcontractors performing activities in connection with the work, shall enter into a written agreement containing the indemnification and hold harmless clauses of Article XII, Paragraph A in favor of Tennessee Gas, requiring the agreement to be entered into by the subcontractor prior to the performance of any work by the subcontractor. Exhibit "B" to the Alliance Agreement is the work request form issued to CMC providing a full description of the work to be performed as follows: "Lower pipe and install rip-wrap on 24 in. line 500-1 at M.P. 525-1+ 5.55 at Quatra Bayou Crossing". Tennessee Gas estimated the cost of this job at $564,321. Exhibit "B" to the Alliance Agreement is part of Exhibit "1".

Exhibit "D" of the Alliance Agreement contains the insurance requirements. This exhibit requires that Tennessee Gas be named as an additional assured under CMC's CGL policy. (See page 4 of Exhibit "D" of the Alliance Agreement which is Exhibit "1").

CUIC provided a CGL policy to CMC for the policy period October 1, 1998 through February 6, 2000. CUIC therefore was the CGL carrier for CMC during the time in question.

## CMC NEEDS HELP – THE CMC/DIAMOND SERVICES CONTRACT

CMC and Diamond Services entered into a Master Service Contract on December 1, 1999. (Master Service Contract attached as Exhibit "2") As with these types of Master Service contracts in the industry, the contract provided for both insurance and indemnity.

Paragraph 2.1 of the Master Service Contract provides:

> 2.1   Without prejudice to, or otherwise diminishing Sub-Contractor's duties under the indemnities clause hereunder, Sub-Contractors at its own cost and expense, shall procure, and throughout the term of this agreement maintain in full force and effect, insurance on forms and with insurers approved by CMC, providing CMC at least (30) days advance written notice of cancellation, as follows:
>
> (d) (ii) Protection and Indemnity Insurance (SP 23 Form or equivalent) including, but not limited to, coverage for injuries to or death of masters, mates, and members of the crew, transportation, wages, maintenance and cure, with geographic extensions of coverage to the Gulf of Mexico and other areas in which the vessel may operate, in an amount of at least $5,000,000.00, with deductible in said policy not exceeding $25,000.00, and with the phrase "As owner of the vessel named herein" being deleted, and with all phrases purporting to limit the underwriter's liability to the value of the vessel or to that of an owner being deleted; providing in rem protection; and naming CMC and any of CMC's co-venturers, co-operators, partners and customers as additional assureds, and waiving all rights of subrogation against CMC and any of CMC's co-venturers, co-operators, partners and customers; and, if the vessel is a tug or engaged in towing, deleting the

3

> exclusion of claims arising out of or having relation to towage of any other vessel or craft;

(Master Service Contract attached as Exhibit "2")

Paragraph 2.3 of the Master Service Contract provides:

> All said insurance policies must contain clauses to the effect that any other policies covering CMC and its co-venturers, co-operators, partners and customers, are to me non-contributory and the coverage required by this contract is to be primary. No "other insurance" provision shall be applicable to CMC and its affiliated, subsidiary, inter-related companies, or its co-venturers, co-operators, partners, or customers by virtue of having been named an additional assured or loss payee under any policy. Sub-Contractor's liability under this agreement is in no way limited to, or by, the insurance set forth above, or by the monetary amounts of those insurances; Sub-Contractors shall be and remain liable to the full extent as determined otherwise by this contract or by law.

(Master Service Contract attached as Exhibit "2")

The Master Service Contract between CMC and Diamond Services contained reciprocal indemnity provisions for both personal injury and property damage.

Paragraph 3.0 (b) contains the indemnity provision concerning property damage and the applicable portion reads as follows:

> CMC releases Sub-Contractor and its sub-contractors from any liability to CMC for, and CMC will defend, indemnify and hold Sub-Contractor and its sub-contractors harmless from and against, all suits, actions, claims and demands based on property damage or loss, whenever occurring, suffered or incurred by CMC, its other contractors and sub-contractors, its co-venturers, co-operators, partners and customers and the officers, employees, agents, and representatives of any of them, arising from or relating in any way to the performance of the work hereunder, regardless of how such property damage or loss is caused even if caused by the negligence, whether sole or concurrent, or active or passive, or other legal fault, including strict liability, of sub-contractor or its sub-contractors.

(Master Service Contract attached as Exhibit "2")

Therefore, prior to the work giving rise to the damages at issue in this suit, CMC and Diamond Services entered into a Master Service Contract that required, in part, that Diamond Services obtain P&I coverage of $5,000,000.00; that CMC and Tennessee Gas be named as additional assureds to the P&I policy; and that underwriters waive all rights of subrogation against CMC and Tennessee Gas.  In addition, the contract provided that CMC would defend and indemnify Diamond Services from and against all claims and demands based on property damage suffered or incurred by CMC or its customers (Tennessee Gas).  As this court is well aware, it must read the insurance procurement and indemnity provisions in conjunction with each other in order to properly interpret the meaning of this contract.

As a result of the Master Service Contract entered into between CMC and Diamond Services, Diamond Services provided the services of its Diamond Dredge #9.  It is the Diamond Dredge #9 that is alleged to have caused the damage to the pipeline, giving rise to this litigation.  There is no dispute that the contract entered into between Diamond Services and CMC was for the furnishing of vessel services.

## THE INSURANCE POLICIES: WHO PAYS WHAT; AND WHO PAYS FIRST?

Diamond Services had in effect at the time of the casualty in question  P&I policy #GCM99656 effected by Gulf Coast Marine, Inc. issued to Diamond Services for the policy period September 10, 1999 to September 10, 2000. (P&I Policy #GCM99656 attached as Exhibit "3")  The schedule of vessels contained in the policy identifies the Diamond Dredge #9 and indicates that the P&I coverage provided for the vessel is in the amount of $5,000,000.00. The

5

policy specifically contains a "Blanket Additional Assureds and Waiver of Subrogation" endorsement which provides in part as follows:

> Privilege is hereby granted the Assured to name others for whom the Assured is performing work as Additional Assureds on this policy, provided the Assured shall have exercised this option prior to the loss. Privilege is also granted the Assured to release from Liability others for whom the Assured is performing operations, or who are performing for the Assured, provided the Assured shall have exercised this option prior to loss; and these insurers waive all rights of subrogation against any parties so released. Any phraseology required to the incorporated in this Policy by parties favored by the Assured with one of the above options shall be deemed to be incorporated herein, but to no greater extent than the privilege allowed by the above options.
>
> Notwithstanding the proceeding provisions, no party shall be deemed an Additional Assured or favored with a waiver of subrogation on any vessel insured hereunder which is not actually engaged or involved in the intended operations at the time of the loss, if any.
>
> Where required by contract, or agreed to by the Assured, it is understood and agreed that:
>
> (1) Permission is also granted to name Additional Assureds with waiver of subrogation and notice of cancellation those individuals, partnerships, joint venturers or corporations for whom the Assured is working, directly or indirectly, when required, provided the loss or damage, as a result of which rights would arise, occurs during or as a result of the actual performance of such work.
>
> (2) Ascent given for all waivers of rights of recovery made before or after the inception of this Policy, but prior to a loss.
>
> (3) Policies shall be primary and without right of contribution of other insurance which maybe available to or by the certificate holder.
>
> (4) Any "Other Insurance Clause" contained herein shall be void and inoperative.
>
> . . .

> (7) The so-called "Limitation of Liability", "Other Than Owner" and "As Owner Of" clauses as they appear in the printed forms contained herein shall not apply.

(P&I Policy #GCM99656 page 11, attached as Exhibit "3")

The P&I section of the policy provides that the limit of liability under that section shall not exceed $5,000,000.00. It also provides a contractual liability extension clause which reads:

> In consideration of the premium charged for this insurance, the coverage afforded under this policy is extended to insure the liability of the assured arising out of hold harmless and/or indemnity agreements contained in such contracts that have been entered into by the Assured for the furnishing of vessel services.
>
> The coverage afforded by this contractual liability extension applies only to written contracts, which have been entered into by the Assured prior to an accident/occurrence given rise to a claim hereunder.

(P&I Policy #GCM99656, page 40, attached as Exhibit "3")

Therefore, it is clear from the terms of the policy, that the P&I carriers for Diamond Services agreed to name as additional assureds under the policy CMC and Tennessee Gas. Further, as required by the contract, they agreed to waive all rights of subrogation against CMC and Tennessee Gas. Most importantly, as required by the contract, Diamond Services' P&I underwriters agreed that the coverage provided by its policy, for CMC and Tennessee Gas, shall be primary and without right of contribution of other insurance which may be available to or by the certificate holder (CMC and/or Tennessee Gas). The contract requires this and the P&I policy provides for it.

CUIC provided CGL Policy Number BCG000460 for the policy period October 1, 1998 to February 6, 2000 to CMC. The CGL Policy provides in Section I, Coverage A(1)(a) as follows:

7

> We will pay those sums that the insured becomes legally obligated to pay as damages because of..."property damage" to which this insurance applies...

(CGL policy #BCG000460, page 60, attached as Exhibit "4")

Exclusion 2(b), Contractual Liability reads:

> This insurance does not apply to..."property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:
>
> (1)   That the insured would have in the absence of the contract or agreement or;
>
> (2)   Assumed in a contract or agreement that is an "insured contract", provided the...property damage occurs subsequent to the execution of the contract or agreement.

(CGL policy #BCG000460, page 60, attached as Exhibit "4")

The definition of insured contract is contained in Section V, Paragraph 8(f). This section reads that an "insured contract" means:

> That part of any other contract or agreement pertaining to your business...under which you assume the tort liability of another party to pay for..."property damage" to a third person or organization. Tort liability means that liability that would be imposed by a law in the absence of any contract or agreement.

(CGL policy #BCG000460, page 70, attached as Exhibit "4")

Of special note is the Protection and Indemnity Exclusion contained within the CUIC, CGL policy. The Protection and Indemnity Exclusion reads:

> It is agreed and understood that this policy affords no coverage for losses which would be covered under a P&I and/or P&I contractual policy, and/or any losses arising out of the use or operation of any owned vessel, or out of the activities of the master or crew of any owned vessel.

(CGL policy #BCG000460, Page 49, attached as Exhibit "4")

Therefore, it is important to note that for those losses to which the contractual indemnity coverage would otherwise apply, the policy excludes coverage ("this policy affords no coverage") for losses which would be covered under a P&I and/or P&I contractual policy. Please remember that there is no doubt nor controversy that the loss in question is covered by a P&I policy. Diamond Services' P&I carrier has already paid, under the provisions of its policy, over $495,000.00 to CMC for costs incurred for the repair of the damage in question.

## DIAMOND SERVICES FIGHTS THE LAW AND THE LAW WINS: ADDITIONAL ASSURED PROVISIONS COME BEFORE INDEMNITY

Diamond Services' assertion that this is a case of first impression is incorrect. Further, its assertion that CMC is provided no contractual indemnity coverage under Diamond's P&I policy is also wrong.

Please remember this is a simple question for the court to resolve. The court must interpret the contract between CMC and Diamond Services, which contains both additional assured provisions and indemnity provisions, and determine what comes first and what comes second. The United States Fifth Circuit Court of Appeals has provided clear and unambiguous guidance in directing this court to rule that the additional assured provisions come first and the P&I policy limits must be exhausted before the indemnity required under the contract comes into play. Tullier v. Halliburton Geophysical Services, Inc., 81 F. 3d 552 (5th Cir. 1996), provides the court with all the guidance it needs to make this determination.

First, as concerns whether or not contractual indemnity coverage is provided to CMC under the P&I policy, a simple reading of the policy provision indicates that contractual indemnity coverage is provided to CMC.

When one reads the Contractual Liability Extension provision in the P&I section of the policy provided by the P&I underwriters for Diamond Services in terms of CMC as the assured, it is obvious that contractual liability coverage is provided to CMC.

Reading the Contractual Liability Extension clause in terms of CMC as the assured, one obtains the follows:

> "[t]he coverage afforded under this policy is extended to insure the liability of CMC arising out of hold harmless and/or indemnity agreement contained in such contracts that have been entered into by CMC for the furnishing of vessel services."

(P&I policy #GCM99656, page 40, attached as Exhibit "3")

The reading which Diamond Services gives to this provision is extremely narrow and assumes conditions which are not contained in this provision. The policy does not read that the coverage is provided arising out contracts that have been entered into for the furnishing of the Assured's vessel's services. It simply states that contractual insurance coverage is extended to insure the liability of CMC arising out of hold harmless and/or indemnity agreements contained in contracts that have been entered into by CMC for the furnishing of vessel services. It does not state and does not require that the vessel services be furnished by the Assured. There is no question that the contract that CMC entered into with Diamond Service's was "for the furnishing of vessel services." The contract entered into by CMC was "for the furnishing of vessel services" and those services were provided by Diamond Services' Dredge #9.

As this court is well aware, when interpreting insurance clauses concerning the provision or exclusion of coverage the court is to read any ambiguous clauses in favor of coverage.

<u>Williamson v. J.C. Penney Life Insurance Company,</u> 226 F.3d 408 (5th Cir.2000); <u>Meredith v. Louisiana Federation of Teachers,</u> 209 F.3d 398 (5th Cir.2000).

Therefore, it is clear that there is contractual liability coverage extended to CMC under the P&I policy provided by the P&I underwriters of Diamond Services.

However, whether or not contractual coverage is provided under the P&I policy is of no moment for the determination by the court of the simple question of what comes first in the contract at issue.

In <u>Tullier, supra,</u> the plaintiff was an employee of HGS who fell while working aboard a vessel owned by McCall. The plaintiff settled with HGS and McCall which in tern generated a controversy under the parties' time charter agreement. Both McCall and HGS agreed to indemnify and defend the other party from and against claims brought by one or on behalf of the indemnitor's employees. As the court pointed out, while the cross-indemnity provisions were identical, the parties agreed to treat the insurance provisions backing up the indemnitees differently. HGS was required to insure the liabilities it assumed under the charter with a CGL policy with appropriate maritime endorsements.

However, McCall agreed to provide P&I coverage providing full coverage for additional assureds and to provide contractual liability coverage covering the obligations of the owner to HGS under the time charter and to delete the "as owner" limitations as respects the additional assureds to underwriters against claims by the additional assureds. Additionally, McCall was to obtain CGL coverage in addition to P&I. On all policies of insurance obtained by McCall, McCall was to obtain endorsements from its underwriters providing that HGS shall be named by endorsement as an additional assured.

Further, all insurance required by McCall was to be endorsed to provide that the insurance provided shall be primary insurances, as respects to the additional assureds, irrespective of any "excess" or "other insurance" clauses contained therein. The court recognized that McCall's insurance was intended specifically to cover HGS as an additional assured, to delete the "as owner" limitations with respect to HGS and to constitute primary coverage for the additional assured.

The positions of the parties here are the same as those in Tullier. HGS is the indemnitor in Tullier and CMC is the indemnitor here. McCall was the indemnitee who was required to obtain liability insurance naming the indemnitor, HGS, as an additional assured. Here, Diamond Services is the indemnitee required to name CMC as an additional assured under its liability policies. There is no difference and Tullier controls.

In Tullier, the district court ruled in favor of McCall (Diamond Services), holding that because HGS (CMC) was obligated to indemnity McCall (Diamond Services) for injuries to HGS's employee (the damage to the pipeline), HGS (CMC) could not rely on McCall's (Diamond Services) insurance through the additional assured provision to fulfill its responsibility. The Fifth Circuit overturned the ruling of the district court. In discussing the principals applied in reading the insurance and indemnity provisions of the contract together the court stated:

> In a line of cases commencing with Ogea v. Loffland Brothers Co, 622 F.2d 856 (5th Cir. 1980), this court has held that a party such as McCall, who has entered into a contractual indemnity provision but who also names the indemnitor, here HGS, as an additional assured under its liability policies, must first exhaust the insurance it agreed to obtain before seeking contractual indemnity. See also, Klepac v. Champlin Petroleum Company, 842 F.2d 746 (5th Cir. 1988), rehearing denied 844 F.2d 788 (1988); Woods v. Dravco Basic Materials Company, 887 F.2d 618 (5th Cir. 1989). Ogea held that the insurance procurement and indemnity provisions of a

> drilling contract "must be read in conjunction with each other in order to properly interpret the meaning of the contract." Ogea, 622 F.2d at 190.

ullier, 81 F.3d at 553-554

In further discussing how the courts should interpret the insurance and indemnity provisions, the court went on to state:

> McCall seeks to distinguish Ogea on two grounds and to gain support from it on one.  First, in Ogea the only insurance obligation under the contract required Loffland (the party entitled to indemnity) to secure insurance for Phillips (the indemnitor) as an additional insured.  But here, McCall points out, HGS, the indemnitor, agreed to cover its liability under the time charter agreement by purchasing insurance.  Second, Ogea states that Phillips specifically negotiated the obligation of Loffland to procure insurance for Phillips, whereas no similarly specific bargain was struck with HGS.  Taking advantage of Ogea, however, McCall observes that the opinion criticized Loffland's emphasis on the mutual indemnity clauses to the exclusion of the insurance purchase clause of the parties' contract.  Similarly, according to McCall, HGS hopes to enforce the insurance procurement provision imposed on McCall while ignoring its own contractual liability to furnish insurance.
>
> These distinctions are not persuasive.  The controlling fact in Ogea, as in this case and in Leblanc, Klepac and Woods is the existence of "additional assured" coverage whereby an indemnitee agreed to procure insurance coverage for the benefit of the indemnitor.  The import of the additional assured clause is emphasized here because the time charter also required that insurance procured by McCall must afford primary coverage to HGS.  The time charter could hardly have been more specific in protecting HGS's indemnity obligation by means of McCall's insurance.
>
> The fact that the parties may not have directly negotiated this result, as they apparently did in Ogea, is not controlling.  Ogea rests on the legal imperative to read the indemnity and insurance procurement provisions harmoniously.  Ogea, supra at 190.  Moreover, as HGS notes, it is not unfair for McCall's additional assured coverage to bear HGS's indemnity obligation here because, if McCall complied with the insurance procurement provision, it could have charged HGS with the enhanced insurance

> coverages as part of its daily rental rate. HGS paid for the insurance one way or anther.
>
> Finally, this interpretation of the insurance procurement provision does not ignore HGS's agreement to "insure the liabilities it assumes" under the contract. McCall was required to supply primary coverage up to $1,000,000 per incident, with HGS as an additional assured. HGS, therefore, contracted to insure liabilities over that amount in fulfillment of its indemnity responsibility. All provisions of the HGS-McCall time charter are integrated by the Ogea-LeBlanc reasoning that the unilateral insurance procurement provision precedes the indemnity requirement of the contract."

Tullier, 81 F.3d at 554.

Finally, in overturning the district court's ruling, the court, further explaining its reasons, stated:

> Ogea and its progeny most appropriately guide the resolution of this case, even though HGS as well as McCall undertook an obligation to insure liabilities under the time charter. HGS's insurance obligation, however, likes its indemnity duty, was qualified by the provision requiring McCall to name HGS as an additional assured and to render that insurance's primary coverage.

Tullier, 81 F.3d at 555.

Whether or not there is contractual indemnity coverage under Diamond Services' P&I policy for CMC is of no moment. What is important is that the liability insurance provided on behalf of both Diamond Services and CMC under Diamond Services' P&I policy is primary to both and therefore, before CMC can be called upon to provide indemnity to Diamond Services, the limits of the P&I policy must be exhausted. Then and only then can CMC be called upon to provide indemnity to Diamond Services. In this instance, the coverage provided by Diamond Services' P&I policy has a $5,000,000 limit. Until that limit is exhausted, no indemnity is due from CMC to and/or for Diamond Services.

## JETSAM, FLOTSAM AND LIGAN

Although CUIC firmly believes that the court need not go further than discussing the issues outlined above, CUIC will briefly address the peripheral issues additionally presented by Diamond Services.

Central Towing has not made a claim for indemnity and therefore its policy need not be addressed.

Diamond Services makes bold assertions of the effect of the supposed factual differences in this case as opposed to those encountered by the courts previously, without any legal authority for their position. Again CUIC stresses to the court that it must look at both the insurance procurement and indemnity provisions of the contract and must read them in conjunction with each other in order to properly interpret the meaning of the contract. Here, the court is still left with two provisions in the contract (insurance and indemnity) which must be read together and applied harmoniously. Viewing the facts in a light most favorable to Diamond Services, you are still left with a situation where Diamond Services' P&I underwriters provide primary coverage to Diamond Services and CMC for this loss, with CMC to indemnify Diamond Services for the loss. Even under these circumstances, Tullier provides the court with all the necessary guidance to hold that the indemnity provisions of the contract do not come into play until the policy limits of Diamond Services' P&I policy have been exhausted.

Finally, it is the position of CUIC that in this case should CMC be called upon to provide indemnity then the CGL policy provided by CUIC does not provide coverage for this loss.

Diamond Services alleges that the claim for which they seek indemnity is a contractual indemnity claim and not a P&I claim. As pointed out above, the CUIC, CGL policy contains an

exclusion which provides that the policy affords no coverage for losses which would be covered under a P&I and/or P&I contractual policy. Diamond Services cannot deny that the loss in question is covered by a P&I policy. They have paid over $495,000 already under their P&I policy for the damages incurred. The claim for which they seek indemnity is a P&I claim and the exclusion in the CUIC, CGL policy would apply.

## CONCLUSION

The additional assured provisions of the contract are to be applied and enforced before the indemnity provisions of the contract. Indemnity does not come into play in this case until Diamond Services' P&I underwriters exhaust their policy limits ($5,000,000). Tullier makes it clear that this is how it is suppose to be.

Therefore, CUIC asks this court to find that the additional assured provisions in the contract are to be enforced before contractual indemnity can be claimed from CMC by Diamond Services.

Respectfully submitted,

**LEONARD & LEONARD, Ltd.**
**A Professional Law Corporation**

By: _____
J. DANIEL RAYBURN, JR. (#11404)
MELVIN A. EIDEN (#19557)
2448 Johnston Street
Post Office Box 91823
Lafayette, Louisiana 70509-1823
Telephone No. (337) 233-4424
ATTORNEYS FOR COMMERCIAL
UNDERWRITERS INSURANCE COMPANY

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the above and foregoing pleading has this day been forwarded to all known counsel of record in this proceeding by depositing same in the United States Mail, postage prepaid and properly addressed.

At Lafayette, Louisiana, this 26TH day of April, 2001.

_____
J. DANIEL RAYBURN, JR.

**SEE RECORD FOR EXHIBITS OR ATTACHMENTS NOT SCANNED**