

RECEIVED APR - 2 2001 CHAMBERS OF U.S. DISTRICT JUDGE ELDON E. FALLON

U.S. DISTRICT COURT EASTERN DISTRICT OF LOUISIANA FILED APR - 2 2001 LORETTA G. WHYTE CLERK

55160/RBA/bcb                                                      0265-5765

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN THE MATTER OF THE COMPLAINT OF DIAMOND SERVICES CORPORATION, ON BEHALF OF THE DIAMOND DREDGE NO. 9 FOR EXONERATION FROM OR LIMITATION OF LIABILITY | CIVIL ACTION<br><br>NUMBER: 00-0156<br><br>SECTION: "L" (3) |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| JOSEPH FORET, JR. | CIVIL ACTION |
| VERSUS | NO.: 00-0708 |
| CENTRAL GULF TOWING, INC. | SECTION: "L" (3) |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| IN THE MATTER OF CENTRAL GULF TOWING, INC., AS OWNER *PRO HAC VICE* OF THE M/V VIVIAN, PRAYING FOR EXONERATION FROM AND/OR LIMITATION OF LIABILITY | CIVIL ACTION<br><br>NUMBER: 00-1166<br><br>SECTION: "L" (3) |

### PRE-TRIAL ORDER

#### I. PRE-TRIAL CONFERENCE DATE:

The pre-trial conference was held on April 3, 2001 at 1:30 P.M., before the

Honorable Eldon E. Fallon.

DATE OF ENTRY
SEP 1 2 2001



Fee_____
Process____
X Dktd____
CtRmDep___
Doc.No._____

## II. **APPEARANCE OF COUNSEL:**

MICHAEL L. McALPINE, T.A. (#9195)
RICHARD A. COZAD (#4537)
ROBERT B. ACOMB, III (#2303)
McALPINE & COZAD
701 South Peters St., Suite 300
New Orleans, LA  70130
Telephone:  (504) 561-0323; Fax:  528-9442
*Attorneys for Diamond Services Corporation*

Grady S. Hurley, Esq. (#13931)
Christopher S. Mann, Esq. (#26397)
Jones, Walker, Waechter, Poitevent,
  Carrere & Denegre, L.L.P.
201 St. Charles Avenue
New Orleans, LA 70170
Telephone: (504) 582-8224; Fax: 582-8010
*Attorneys for Tennessee Gas Pipeline, Inc.:*

Robert S. Reich, (#11163)
Lawrence R. Plunkett, (#19739)
Reich, Meeks & Treadaway
Two Lakeway Center, Suite 1000
3850 N. Causeway Blvd.
Metairie, LA 70002
Telephone: (504) 830-3999; Fax: 830-3950
*Attorneys for Central Gulf Lines, Inc.:*

J. Daniel Rayburn, Jr., (#11404)
Leonard & Leonard, Ltd.
2448 Johnson Street
P. O. Box 91823
Lafayette, LA 70509-1823
*Attorneys for Commercial Underwriters Insurance Co.*

Charles F. Seeman, Jr., T.A. (#11912)
Keith J. Bergeron, (#25574)
Deutsch, Kerrigan & Stiles
755 Magazine Street
New Orleans, Louisiana   70130
Telephone: (504) 581-5141; Fax: 566-1201
*Attorneys for T. Baker Smith & Son, Inc.*

Scott R. Wheaton, Jr.
Stanley J. Cohn
Lungenbuhl, Burke, Wheaton,
 Peck, Rankin & Hubbard
Pan-American Life Center Blvd.
601 Poydras Street, Suite 2775
New Orleans, LA 70130
Telephone: (504) 568-1990; Fax: 529-7418
*Attorneys for Central Gulf Towing, Inc.*

David A. Hilleren
Billy Wright Hilleren
Hilleren & Hilleren
P. O. Box 9150
Mandeville, LA 70470
*Attorneys for Joseph Foret, Jr.*

## III. **DESCRIPTION OF THE PARTIES:**

A.  Diamond Services Corporation is the owner/operator of the Diamond Dredge

No. 9, and has filed for exoneration from and/or limitation of liability.

B.  At all material times, Tennessee Gas Pipeline Company was the owner and

operator of a pipeline located at Four Bayous and has filed a Claim against Diamond

Services Corporation and a Cross-Claim against Chet Morrison Contractors, Inc.

C.  Chet Morrison Contractors, Inc. ("CMC") is a corporation organized and

existing under the laws of the State of Louisiana.

D.  Commercial Underwriters Insurance Company is the CGL carrier for Chet Morrison Contractors, Inc.

E.  TBS is a Louisiana corporation licensed to provide professional engineering and land surveying services.  Tennessee Gas Pipeline hired TBS to locate, survey and mark some sections of its 24" gas transmission pipeline where it crossed Quatre Bayou Pass in southern Plaquemines Parish.  Diamond Services Corporation and Central Gulf Towing, Inc. have filed Third Party Complaints against TBS in suits No. 00-0156 and 00-1166.  TBS is not a named defendant or participant in suit No. 00-0708.

F.  Central Gulf Towing, Inc., was the owner pro hac vice and operator of the M/V VIVIAN at all material times.

G.  Claimant, Joseph Foret, Jr., has asserted negligence claims under the General Maritime Law against Plaintiffs in Limitation, Central Gulf Towing, Inc. and Diamond Services Corporation arising from the collision of the VIVIAN (Central Gulf) Dredge #9 (Diamond), with the M/V SUSAN MORRISON on which Foret was a deckhand.


IV.  **JURISDICTION:**

This is a cause in exoneration from and limitation of liability, civil and maritime, under Rule 9(h) of the Federal Rules of Civil Procedure, and Rule F of the Supplemental Rules of Admiralty and Maritime Claims.  Jurisdiction is uncontested.

Jurisdiction also exists under the General Maritime Law.

V.  **PENDING MOTIONS**:

A.  Diamond Services Corporation will file a motion for leave to file a counter-claim against Chet Morrison Contractors and a cross-claim against CMC's general liability insurer, Commercial Union Underwriters Insurance Company for recovery-over for payment of $495,759.00 to Chet Morrison Contractors for repair of the TGP pipeline based upon contractual indemnity language of the Diamond Services/Chet Morrison Contractors' Master Service Contract, which requires CMC to indemnify Diamond Services from the claims of its customer, TGP.

C. CMC reserves the right to file Motions in Limine as necessary prior to trial.

E.  TBS does not anticipate any motions which must be decided prior to trial.

F.  Central Gulf Towing and Diamond Services have entered into an agreement, which has not yet been confirmed in writing despite Central Gulf's request, that Diamond Services will defend and indemnify Central Gulf Towing in connection with the pipeline damages aspect of the consolidated cases and Central Gulf Towing will defend and indemnify Diamond Services in connection with the personal injury aspect of the consolidated cases.  This agreement needs to be finalized at the pre-trial conference, if not before.  Otherwise, Central Gulf will file a Motion for Partial Summary Judgment.

G.  No motions are pending nor contemplated.

## VI. **SUMMARY OF MATERIAL FACTS AS CLAIMED BY:**

### A. PETITIONER, DIAMOND SERVICES CORPORATION

This matter involves alleged spud damage to an undersea pipeline owned by Tennessee Gas Pipeline ("TGP"). The pipeline was originally surveyed by T. Baker Smith Surveyors ("TBS") in Quatre Bayou Pass, and portions of the pipeline were found to be exposed due to erosion.

TGP contracted with Chet Morrison Contractors, Inc. ("CMC"), to re-bury the pipeline pursuant to an Alliance agreement. CMC contracted with TBS to mark the pipeline with cane poles and flags in the shallows, and Stolt Comex Seaway, Inc., divers to mark the pipeline in deeper water with buoys attached to the pipeline with rope. After unsuccessful attempts to bury the pipeline, CMC contracted with Diamond Services under a master service contract for the use of Dredge No. 9, which was towed to Quatre Bayou by Central Gulf Towing's tug, VIVIAN.

The Diamond dredge arrived on December 14, 1999 around 10:00 A.M., and the captain of the dredge met with the TGP, CMC inspectors, and the TBS surveyor. At this meeting, the dredge captain confirmed with all parties the buoys and flags accurately marked the location of the undersea pipeline and reviewed TBS' charts. No warnings were given to the dredge captain that there was a strong current and at low tide and the buoys could be off position on the pipeline by as much as 5-7 feet.

- 6 -

## COLLISION

As the VIVIAN maneuvered the dredge onto location, it allowed the dredge to bump the stern of the tug, SUSAN MORRISON, which was moored to the barge CMC-5, causing the alleged personal injury of a deckhand, Foret. Diamond Services has no liability for this collision as it was under tow by the Central Gulf Tug, VIVIAN.

## PIPELINE WORK

Approximately ten minutes after this allision, the dredge was maneuvering into position to straddle the pipeline. The dredge captain used the buoys and cane poles to line up his point of reference on the pipeline, and dropped a spud 20 feet from the pipeline, allowing the stern of his dredge to pivot 180 degrees over the pipeline, dropping another spud, stopping the dredge's movement.

Claimants' allege the dredge captain mis-judged the position of the pipeline and the spud contacted the side of the pipeline, causing an 18 inch deformation. Diamond Services denies it was negligent, but if the Court finds the spud did contact the pipeline, then it was the result of the incorrect marking of the pipeline by others for whom Diamond is not responsible. The dredge then worked through the night, dredging from 12 midnight until 4:00 P.M. the next day.

After a meeting where CMC accused the dredge captain of damaging the pipeline, the dredge stopped work, and Diamond Service's tug returned the dredge to the dock, when CMC refused to tow the dredge back to Amelia, Louisiana. Diamond Services have not

been paid for the work the dredge performed, or for the towage back to Amelia, Louisiana. Diamond Services has filed a counter-claim against CMC in the amount of $29,365.00, which figure represents the cost of services of the dredge for 12 hours, and towing costs.

Diamond Services has filed this action for exoneration and/or limitation of liability, in which CMC and TGP have filed claims for reimbursement of the repairs CMC voluntarily made to the pipeline. Diamond has also filed a third-party demand against TBS for negligence in marking the pipeline. Discovery has determined TBS dropped and left at least three or four buoys attached to weights with ropes, which would have drifted off position in the strong current near the critical area where the spud was dropped. A TBS surveyor met with the dredge captain, and failed to warn him the markings for the pipeline could be affected by the tide and currents.

## CMC'S REPAIRS TO PIPELINE

The pipeline repairs were not let out for competitive bid. CMC voluntarily repaired the pipeline on a time and material basis, and claims the repairs cost $943,915.36, based on 56 days repair time from December 15, 1999 through February 8, 2000. The TGP inspector noted in his diary that CMC's repairs were effected in only ten-24 hour days from December 22, 1999 through January 7, 2000. An expert obtained by petitioner, Rimkus Consulting Group, Inc. audited CMC's invoices, and interviewed CMC's personnel and issued a report including the repair job should have been completed in 26 days at a cost of $495,759.00. Diamond Service contends CMC's repair costs are inflated and unreasonable.

- 8 -

The amount and reasonableness of the cost of repairs to the pipeline are still in dispute, as well as the balance of CMC's claim for repairs which exceeds $940,000.00.

In analyzing CMC's claim for voluntary repairs of the pipeline, Rimkus broke the repair job into six critical path operations necessary to repair the pipe; inspect pipe, dredge, drill holes in pipe, fill in line with water, cut and repair pipe, and empty pipe water pipe. Rimkus concluded CMC's non-critical path functions were done in series with a critical path functions, rather than at the same time, resulting in extended repair time and inflating the cost for expensive marine equipment, field labor, materials and diving service, which were significantly in excess of that required to complete the repairs.

### CONTRACTUAL INDEMNITIES

Diamond Services entered into a master service contract with CMC which required Diamond to name and waive CMC and CMC's customer, TGP, as additional assured under its policy of insurance for P&I coverage, but not the GL policy. Diamond services has agreed, without prejudice, to pay CMC the undisputed amount of the repair costs as estimated by the Rimkus report, in the amount of $495,759.00, and reserves its rights under the contractual indemnity terms of the master service contract to bring an action for recovery over from CMC and its insurers, who are required under the same contract to indemnify Diamond Services from claims made by CMC's customers, TGP.

The CMC/Diamond master service contract, contains cross-contractual indemnity agreements, whereby each contracting party agrees to defend and indemnify the other from

- 9 -

claimants identified with the indemnitor. Under the CMC/Diamond contractual language, since TGP was a CMC customer, then CMC and its insurers are obligated to defend and indemnify Diamond from CMC's customers TGP's claim.

Under the CMC/Diamond Services' master service contract, CMC is an additional assured on Diamond's P&I policy, but the contract does not require Diamond provide contractual liability coverage under it's P & I policy, nor does the contract require CMC to be a named an additional assured on Diamond Services' GL policy.

The contractual indemnity language of the CMC/Diamond master service contract requires CMC to defend and indemnify Diamond from the claims of CMC's customers, TGP, since CMC is not an additional insured for contractual liability under either the P&I or the GL policy, and CMC's GL carrier should respond for CMC's contractual obligation to indemnify Diamond Services from the claims of CMC's customer, TGP. Based on the provisions of the Diamond/CMC master service contract Diamond Services is entitled to defense and indemnity from CMC and its GL carrier, and for recovery of any amounts it pays in settlement to CMC for repairs made to CMC's customer, TGP.

The rationale of *Ogea v. Lofland Bros., Co.*, 662 F.2d 186 (5th Cir.1980) and its progeny requiring insurance to be exhausted before indemnity clauses come into play is inapplicable where there is no contractual liability coverage in Diamond Services' P&I policy, which is the only policy where CMC is an additional assured. The contractual indemnity terms of the CMC/Diamond Services' contract requires CMC to indemnify Diamond for the claims

of CMC's customers.  There is no insurance for this particular exposure to Diamond Services, and Diamond Services is entitled to exercise its demand for defense and indemnity from CMC and its insurers' from the claims of CMC's customers, such as TGP.

Diamond Services denies it was liable and/or has anything to do with the alleged injury to the deck hand, Foret, as this arose out of a collision, where the Diamond Dredge No. 9, was under tow by the Central Gulf Tug, VIVIAN, the dominant mind, and had no control over the navigation, which was solely done by the VIVIAN.

Diamond Services contends its Dredge #9 was seaworthy in all respects and properly manned, even if this Court finds the dredge's spud contacted the TGP pipeline, then in that event, it is entitled to limit its liability as this was an error in navigation by the captain of the dredge, which was outside the privity and knowledge of Diamond Services.

B.    TENNESSEE GAS PIPELINE COMPANY

Tennessee Gas Pipeline Company ("TGP") remains in this litigation because Chet Morrison Contractors, Inc. insists that TGP is the real party in interest and directly responsible for the repair costs arising out of the allision damage to its pipeline in December 1999.  TGP and the facts disagree.

Chet Morrison Contractors, Inc. was the general contractor hired to lower a TGP pipeline which was suspended at Four Bayous, Louisiana.  Chet Morrison Contractors, Inc. hired and supervised various subcontractors, including Diamond Services Corporation to assist in the project.

Under the "Alliance Contract" signed by Chet Morrison, his company was to defend and indemnify TGP for any property damage caused by Chet Morrison's negligence. (Article XII) Further, Chet Morrison was obligated to have its subcontractors defend and indemnify TGP for property damage arising out of their negligence. Article XX stated that Chet Morrison Contractors, Inc. was liable for the actions of its subcontractors. In addition, the indemnity obligations were supported by insurance in Article XIII and Exhibit D, which provided that TGP was to be named as an additional assured under policies affording coverage for property damage.

It is hardly disputed that TGP's pipeline was damaged. After the spud of the DIAMOND DREDGE NO. 9 came to rest, T. Baker Smith took a GPS reading. A diver was subsequently sent down at the same location and discovered a dent on the side of the pipeline consistent with the spud.

Chet Morrison acknowledged to Larry Slowik and Mike Bryan of TGP his contractual obligations and began repairs immediately in order to expedite placing the transmission pipeline back into service. TGP was not invoiced, but Chet Morrison maintained records of the time and materials used. TGP was invoiced on a time and material basis for the portion of the job involving the lowering of the pipeline. That invoice was paid in due course.

If this matter proceeds to trial, TGP would like to recover its incidental expenses, legal costs, and any economic losses associated with the shut in of its line.

- 12 -

C.  CMC:

The facts of this matter are generally straightforward and uncomplicated.  The real contested issues involve matters of the proper parties and/or insurers answerable for the costs of repairing the pipeline involved herein.

This matter arises out of an incident which occurred on or about December 14, 1999 in Quatre Bayou Pass, when the spud on Diamond Services' Dredge No. 9 contacted a pipeline owned by Tennessee Gas Pipeline during operations to lower the pipeline.  CMC had contracted with Tennessee Gas Pipeline to lower its pipeline in Quatre Bayou Pass.  In order to accomplish this project, CMC contracted with Central Gulf Towing to provide a tug, the M/V VIVIAN, and with Diamond Services, to supply a dredge, the Dredge No. 9.  Part of Central Gulf and Diamond Services' contractual obligations were to name CMC as additional assureds, waive subrogation and delete the "as owner", limitation of liability and other limiting clauses from the policies.

On the morning of December 14, 1999, Louis Pierre, the dredge captain aboard the Dredge No. 9, met with CMC representatives and Tennessee Gas Pipeline representatives to discuss how the Dredge No. 9 would position itself to dredge around the pipeline.  The manner in which the tug and dredge would approach the work area was determined solely by Pierre. Pierre further directed the movements of the M/V VIVIAN.

While maneuvering onto location, Captain Pierre ordered the dredge's spud dropped to stop the dredge's movement.  After this was accomplished, Gary Guidry, a member of the T.

- 13 -

Baker Smith survey crew, observed that the spud appeared to be very close to the pipeline. He advised Donnie Bergeron, the Tennessee Gas Pipeline company man, of his suspicions. Bergeron and Guidry obtained a precise position of the spud using T. Baker Smith's GPS equipment and, based on other positions obtained during TBS' survey of the line, determined that the spud was on or near the pipeline. Divers subsequently determined that the spud had in fact damaged the pipeline.

CMC undertook repairs of the Tennessee Gas pipeline, which repairs cost in excess of $943,000.00 to complete. (Diamond Services has agreed to pay CMC $495,754.00 for the repairs, reserving CMC's right to recover the balance of the repair costs, as well as interest on the entire amount.) The evidence at trial will establish that the repair procedures, and the costs associated therewith, were fair and reasonable and necessitated by the damage to the pipeline.

CMC submits the damage to the pipeline which necessitated the repairs were caused by the negligence of Diamond Services and/or the unseaworthiness of its barge Dredge No. 9, and/or the negligence and/or unseaworthiness of Central Gulf and its vessel the M/V VIVIAN. This negligence and unseaworthiness was within the privity and knowledge of Diamond Services and Central Gulf, thus precluding Diamond Services and Central Gulf from limiting its liability to the value of their respective vessels.

The crux of this matter involves which parties and/or insurers are answerable for the repair costs. It is not disputed that CMC performed and/or paid for the repairs to the pipeline. Tennessee Gas has asserted a tort and contractual liability claim for damage to its pipeline

- 14 -

against CMC, Central Gulf and Diamond Services. CMC has tendered the claim to its CGL underwriters Commercial Underwriters Insurance Company (CUIC), who, while neither accepting nor rejecting the claim, in turn filed contingent subrogation claims in this matter against Central Gulf and Diamond Services. CMC also filed claims against Central Gulf and Diamond Services and their respective underwriters, Boston Old Colony Insurance Company and Lumberman's Mutual Casualty Company, claiming the right to indemnity and/or insurance coverage for the repair costs. CMC is entitled to recover the full amount of the repair costs from some combination of Tennessee Gas, CUIC, Diamond Services, Central Gulf, Boston Old Colony and/or Lumbermen's.

### D. COMMERCIAL UNDERWRITERS INSURANCE CO:

Commercial Underwriters Insurance Company (CUIC) provided a CGL policy to Chet Morrison Contractors, Inc. (CMC) for the policy period October 1, 1998 through February 6, 2000. CUIC therefore is the CGL carrier for CMC during the time in question.

CMC entered into an Alliance Agreement with El Paso Energy Corporation (El Paso) for the work being performed at the time of the allision in question. Article XII of that agreement provided for indemnity. The contract provided that CMC would indemnify and hold harmless El Paso from all and every kind and character of liability, damages, losses, costs, expenses, demands, claims, suits, actions and causes of action on account of property damage to El Paso arising from any cause whatsoever growing out of or in connection with CMC's negligent

performance of the work contemplated. This section of the Alliance Agreement also required CMC to agree that each of its sub-contractors performing activities in connection with the work, shall enter into a written agreement containing the indemnification and hold harmless clauses of Article XII, Paragraph A in favor of El Paso, requiring the agreement to be entered into by the sub-contractor prior to the performance of any work by the sub-contractor.

In anticipation of the work to be performed by CMC, CMC entered into identical contracts with Diamond Services Corporation (Diamond) and Central Towing, Inc. (Central). These contracts are identical and have the identical insurance and indemnity provisions applicable to this matter.

The contract between CMC and Diamond/Central requires Diamond/Central to obtain Protection and Indemnity Insurance (P&I) in an amount of at least $5,000,000 with the phrase "as owner of the vessel named herein" being deleted, and with all phrases purporting to limit the underwriter's liability to the value of the vessel or to that of an owner being deleted; providing in rem protection; and naming CMC and any of CMC's customers as additional assureds; waving all rights of subrogation against CMC and CMC's customers; and, if the vessel is a tug or engaged in towing, deleting the exclusion of claims arising out of or having relation to towage of any other vessel or craft. The contract also requires Collision Liability Insurance naming CMC and its customer as additional assureds, and waiving all rights of subrogation against CMC and its customer. Further, the contract requires Tower's Liability Insurance naming CMC and its customer as additional assureds and waiving all rights of

- 16 -

subrogation against CMC and its customer. The contract further requires that all said insurance policies must contain clauses to the effect that any other policies covering CMC and its customer are to be non-contributory and the coverage required by this contract is to be primary. No "other insurance" provision shall be applicable to CMC and its customer by virtue of having been named an additional insured under any policy.

After the insurance provisions in the contract comes the indemnity provision. It reads that CMC releases sub-contractor (Diamond and Central) from any liability to CMC and CMC will defend, indemnify and hold sub-contractor harmless from and against all suits, actions, claims and demands based on property damage or loss whenever occurring, suffered or incurred by CMC and its customer arising from or relating in any way to the performance of the work hereunder, regardless of how such property damage or loss is caused even if caused by the negligence, whether sole or concurrent, or active or passive, or other legal fault, including strict liability, of sub-contractor.

The CUIC, CGL policy, defines insured contract in part as, "That part of any other contract or agreement pertaining to your business...under which you assume the tort liability of another party to pay for bodily injury or property damage to a third person or organization. Tort liability means that liability that would be imposed by law in the absence of any contract or agreement."

Most importantly, the CUIC policy contains a Protection and Indemnity Exclusion that reads, "It is agreed and understood that this policy affords no coverage for losses which would

- 17 -

be covered under a P&I and/or P&I contractual policy, and/or any losses arising out of the use or operation of any owned vessel, or out of the activities of the master or crew of any owned vessel". Both the Diamond and Central P&I policies contain Contractual Liability Extension clauses. It is the position of CUIC that both Contractual Liability Extension clauses provide contractual indemnity coverage to CMC.

CUIC relies on Ogea v. Loffland Brothers Company, 662 F. 2d 186 (5th Cir. 1980); Tullier v. Halliburton Geophysical Services, Inc., 81 F. 3d 552 (5th Cir. 1996); Computalog U.S.A., Inc. v. Mallard Bay Drilling Company, 21 F. Supp. 2d 620 (Eastern District 1998) for the proposition that under the contract containing both insurance provisions and indemnity provisions, the insurance provisions are to be read and applied first, and therefore, the P&I policies answer for the damages to the Tennessee Gas pipeline until their limits are exhausted before the indemnity provided in the contract comes into play. Therefore, it is the position of CUIC that the P&I policies of Diamond and Central are required to respond to the property damage claims and personal injury claims until their policy limits are exhausted before the indemnity required in the contract by CMC comes into play. Further, as between CMC and CUIC, it is the position of CUIC that the P&I Exclusion in the policy excludes coverage for the indemnity provisions contained in the CMC/Diamond/Central contracts.

E.    TBS:

1.    In deciding when to drop the spud, the dredge captain did not rely on any marker placed by TBS, but on buoys that were clearly placed by others.

- 18 -

2.    TBS did not place the buoys the dredge captain relied on.

3.    The accident was caused solely by the negligence of the captain of the Diamond Services' Dredge No. 9 and/or the negligence of the captain of the M/V VIVIAN in approaching the Tennessee Gas pipeline from up-current with a strong current running, when the proper method of approaching would have been to bring his vessel down-current and have it pushed back against the current, thereby having the maximum rudder control for the VIVIAN but the lowest and most controllable speed over the ground.

4.    The accident was caused because the Dredge was not under complete control, and was going too fast, thus making it impossible (a) to determine accurately when to drop the spud, and (b) to stop the Dredge without it dragging the spud in the bottom.

F.  Central Gulf Towing, Inc.:

Central Gulf Towing, Inc. is the owner pro hac vice and operator of the M/V VIVIAN. Central Gulf Towing was hired by Chet Morrison, a contractor for Tennessee Gas Pipeline to assist in dredging operations with regard to a Tennessee Gas pipeline for the Quatre "Four Bayou" project near Grand Isle, Louisiana. The job involved lowering approximately 200 feet of exposed pipeline.

Central Gulf dispatched the M/V VIVIAN to tow the Diamond DREDGE #9. On December 14, 1999, the M/V VIVIAN was under the command of Captain Danny Chaisson. Also in the immediate area of the pipeline in Quatre Bay Field was the M/V SUSAN MORRISON, a vessel owned and operated by Chet Morrison.

- 19 -

The M/V VIVIAN and Diamond DREDGE #9 were a few hundred yards away from the pipeline on December 14, 1999, when the M/V VIVIAN was ordered to tow the dredge to the pipeline to begin operations. The current in the area of the pipeline was extremely fast that day and made maneuverability very difficult. Capt. Chaisson positioned his vessel in such a way that he thought he would be able to steer the VIVIAN and tow to the pipeline and off of the starboard side of the M/V SUSAN MORRISON, which was located, at the time, between the pipeline and the VIVIAN. Shortly after receiving the order to bring the DREDGE #9 to the job site, Capt. Chaisson put the M/V VIVIAN in gear and started her short voyage to the pipeline site. Unfortunately, Capt. Chaisson did not adequately compensate for the current. DREDGE #9, while moving very slowly, made a very soft bump, or contact, with the stern of the M/V SUSAN MORRISON. No significant damage was caused to the dredge or the hull of the SUSAN MORRISON as a result of the impact.

At the time of the soft bump, Capt. Chris Billiot and Floyd Foret, crew members on the SUSAN MORRISON, were sitting in their vessel's galley. Both gentlemen felt the slight contact. Neither man was jolted from his seat in the galley.

Floyd Foret continued working his usual hitches through December and early January. During one of his days off of the vessel, Foret participated in a favorite hobby, duck hunting. He took his pirogue to his usual duck hunting spot. He was able to man-handle the pirogue by himself in/out of his vehicle, in/out of the water, and he was able to sit in the small craft for a significant period of time while he hunted. About one week after the hunting experience,

Foret had an MRI taken, which his doctor, Gary Guidry, M.D., relied upon to perform surgery during late November, 2000.

Foret was examined by numerous physicians, two of whom included Drs. Sweeney and Moss, both orthopedic surgeons who concluded that the soft impact between the dredge and vessel, as described to them by Foret, was not of the severity to cause a disc herniation in the lumbar spine for which Foret underwent surgery. There were intervening causes for Foret's lumbar disc problem, such as the duck hunting incident when Foret manhandled a cumbersome pirogue just one week before he underwent an MRI during mid-January, 2000, about one month post-collision.

Foret is expected to return to employment in the medium to light duty rating. He is currently six months post-surgery.

In regard to the limitation of liability, the M/V VIVIAN had a fair market value of $450,000.00 and pending freight of $9,301.77 at the conclusion of the voyage on December 14, 1999.

G.  Claimant, Joseph Foret, Jr., is a 38 year old male who lives in Grand Calliou, Louisiana, with his fiancé, Cathy Verdin. He has no children of his own, but Cathy's 12 year old son lives with them. He graduated from high school at South Terrebonne High School in 1981. He has worked primarily in the maritime business as a deckhand for such companies as C&R Towing, Dupre Brothers, B&S Towing, and Chet Morrison General Contractors.

On December 14, 1999, Joseph Foret, Jr. was employed by Chet Morrison General Contractors, and was working as a deckhand aboard the M/V SUSAN MORRISON and its barge, CM5. The CM5 was spudded down and stationary at a location in Quatre Bayou (inland waters) Louisiana. The M/V SUSAN MORRISON and the CM5 were assigned to a pipeline project for Tennessee Gas employing a pump to suction sand from under a pipeline to lower it. Mr. Foret and the captain of the vessel were seated in the galley of the M/V SUSAN MORRISON at the time in question. During the crossing of Quatre Bayou to get into position astride the pipeline, the DREDGE NO. 9 owned by Diamond Services and in the tow of the M/V VIVIAN owned by Central Gulf Towing, Inc. struck the stern, starboard corner of the M/V SUSAN MORRISON. The DREDGE NO. 9 weighed 500 tons and was moving in a swift current of approximately 10 knots. The hard impact delivered to the M/V SUSAN MORRISON by the collision transmitted its force to Joseph Foret, Jr., who received a jolt and twisted his back while seated at the galley table. After going out on the deck to determine what had happened and what damage had taken place, Joseph Foret, Jr. reported back pain to the captain.

During the evening, Mr. Foret returned home and told Cathy Verdin what had happened and that his back was sore. She proceeded to give him a rubdown. Joseph Foret, Jr. went to the Chet Morrison Contractors' office the next day and asked for medical attention. The company sent him to Dr. Robert Davis who noted that Mr. Foret was in a boating accident the day before and had lower back pain with stiffness. He noted slight tenderness and tension in

- 22 -

the muscles. Dr. Davis diagnosed mild lumbar strain and returned him to duty, advising him to take Motrin or Advil. On December 20, 1999, Mr. Foret saw his family doctor, Dr. Brian Matherne. Dr. Matherne noted that Mr. Foret was in a tug accident the week before and that he was complaining of lower back pain. He diagnosed lumbosacral strain and prescribed Relafen for his back. Dr. Matherne restricted him from lifting greater than 30 to 40 pounds. Joseph Foret, Jr. returned to Dr. Matherne on December 27, 1999, still complaining of back pain, and the assessment, again, was lumbosacral strain. Mr. Foret was instructed to continue on modified duty. Dr. Matherne again saw Mr. Foret for low back on December 30, 1999, and continued him on modified duty with Vioxx as the medication. Subsequently, he was seen by Dr. Matherne on January 6, 13, and 28, 2000. January 21, 2000, was Mr. Foret's last day of work. An MRI was ordered by Dr. Matherne on January 31, 2000, which showed a right, lateral disc protrusion at L5-S1 causing right partial right sided neural foraminal encroachment, but no compromise of the spinal canal itself. On February 10, 2000, Mr. Foret was sent to Dr. John Sweeney by his employer. Dr. Sweeney indicated that the impression was lumbar disc herniation by MRI scan. Dr. Sweeney indicated to the employer's insurance adjusters that he thought surgery should not be performed upon Mr. Foret and questioned the relationship of the disc to the tugboat accident. On February 18, 2000, Mr. Foret was seen by Dr. Gary Guidry, an orthopedist in Houma, Louisiana. Dr. Guidry noted complaints of back pain radiating into the anterior and posterior leg regions, as well as lumbar muscle spasm. He felt that the right lateral disc protrusion noted on the MRI encroached upon the nerve root at the S1 level. Dr.

Guidry instructed Mr. Foret to remain off work.  An EMG study was ordered by Dr. Guidry which indicated pathology of the right S1 nerve root, which was consistent with disc herniation at the L5 level on the right.  Two epidural steroid injections did not produce relief.  Surgical authorization was requested, but was not obtained until November, 2000.  Defendant, Central Gulf Towing, Inc. obtained an independent medical examination on November 14, 2000.  Dr. Moss confirmed the herniated disc to the right at L5-S1 with partial encroachment and the electromyographic findings pertaining to the S1 nerve root, but recommended against surgical treatment.  Subsequently, Dr. Guidry performed a lumbar laminectomy at L5-S1 on November 28, 2000, at Terrebonne General Hospital.  On December 6, 2000, Dr. Guidry noted that Mr. Foret was post-op laminectomy and that he was having occasional right leg pain, but doing well.  He was given Lortab 5 and was told to remain off work.  He has since been seen on December 26, 2000, January 24, 2001, and February 21, 2001.  He was encouraged to do some walking activities and has remained off work through the present.  He is still taking medications such as Norflex, Vioxx, and Lortab when needed.  Mr. Foret is due to be evaluated by his own vocational expert on March 29, 2001, and defendant's expert during April.

Plaintiff's economist has performed an evaluation of Mr. Foret's earning loss due to the accident.  Using an average earnings figure of $25,689.00, Mr. Foret's earnings loss will be $541,780.53 if totally disabled and $315,867.72 if able to return to minimum wage work.

- 24 -

VII. **UNCONTESTED MATERIAL FACTS:**

A.  DIAMOND SERVICES CORPORATION:

1.  TGP was the owner and operator of the 24" cement-coated pipeline crossing Quatre Bayou Pass;

2.  On December 14, 1999, Diamond Services owned and operated the Diamond Dredge No. 9;

3.  On December 14, 1999, Diamond Services Corporation was a sub-contractor of Chet Morrison Contractors, Inc., working pursuant to a master service contract dated December 1, 1999;

4.  At all material times, Chet Morrison Contractors, Inc. was working for Tennessee Gas Pipeline Company pursuant to an Alliance Agreement No. HC-97088 to lower the pipeline in Quatre Bayou Pass;

5.  At all material times, Diamond Services Corporation was working for Chet Morrison Contractors, Inc. pursuant to a master service contract; and

6.  CMC is not an additional assured under the Diamond Services general liability policy;

7.  CMC voluntarily repaired the TGP pipeline, and the repair work was not let out for competitive bid;

B.  TENNESSEE GAS PIPELINE:

1.  TGP was the owner and operator of a 24-inch, cement-coated pipeline crossing Four Bayous, Louisiana.

2.  On December 14, 1999, DIAMOND DREDGE NO. 9 was owned and operated by Diamond Services Corporation.

3.  On December 14, 1999, Diamond Services Corporation was a subcontractor of Chet Morrison Contractors, Inc.

- 25 -

4.  At all material times, Chet Morrison Contractors, Inc. was working for Tennessee Gas Pipeline Company pursuant to an Alliance Agreement, No. HC 97-088.

5.  Following the damage to its pipeline on December 14, 1999, TGP made demand upon Chet Morrison Contractors, Inc. to repair its line as quickly as feasible so that it could be placed back into service.

C.  CMC:

1.  CMC entered into a contract with Tennessee Gas to lower a pipeline in Quatre Bayou Pass.

2.  CMC entered into a Master Service Contract with Central Gulf Towing dated March 25, 1999.

3.  CMC entered into a Master Service Contract with Diamond Services Corporation dated December 1, 1999.

4.  CMC is an additional named insured on the policy of insurance issued by Boston Old Colony Insurance Company to Central Gulf Towing, Inc. which was in effect at the time of the incident involved herein.

5.  CMC is an additional named insured on the policy of insurance issued to Diamond Services by Lumbermen's Mutual Casualty Company which was in effect at the time of this incident.

6.  CMC repaired the damage to the Tennessee Gas pipeline which occurred on or about December 14, 1999.

7.  CMC's invoices for the repairs to the Tennessee Gas pipeline involved herein total $945,915.36.

D.  COMMERCIAL UNDERWRITERS INSURANCE CO.:

1.  CUIC issued a CGL policy to CMC for the policy period of October 1, 1998 through February 6, 2000.

2.  CMC and El Paso Energy Corporation entered into an Alliance Agreement in August of 1997 applying to the work being performed at the time of the allision.

- 26 -

3.  P&I Policy No. GMC99656 was in full force and effect and issued to Diamond Services Corporation at the time of the allision.

4.  P&I Policy No. P.I.0814628 was issued to Central Gulf Towing, Inc. and it was in full force and effect at the time of the collision and allision.

5.  CMC entered into a Master Service Contract with Central Towing, Inc. on January 25, 1999 which was the contact pursuant to which Central Towing was working for CMC at the time of the collision/allision.

6.  CMC entered into a Master Service Contract with Diamond Services Corporation on December 1, 1999 which was the contract pursuant to which Diamond Services was performing work for CMC at the time of the allision.

E.  TBS:

F.  Central Gulf Towing:

1.  Central Gulf Towing, Inc. was the owner pro hac vice and operator of the M/V VIVIAN at all material times.

2.  The Diamond DREDGE #9 did not sustain significant hull damages as a result of the collision with the M/V SUSAN MORRISON.

3.  Central Gulf Towing had pending freight on the VIVIAN of $9,301.77 on December 14, 1999.

4.  Floyd Foret man-handled his pirogue in and out of his vehicle approximately one week before he had an MRI during January, 2000.

5.  Floyd Foret man-handled his pirogue in and out of the water about one week prior to his MRI in January, 2000.

6.  Floyd Foret duck hunted from his pirogue about one week prior to the MRI in January, 2000.

G.  PLAINTIFF, JOSEPH FORET:

1.     On December 14, 1999, Joseph Foret, Jr. was employed as a deckhand aboard the M/V SUSAN MORRISON by Chet Morrison Contractors, Inc.

2.     The M/V SUSAN MORRISON and its barge, CM5, were in a spudded down, stationary position in Quatre Bayou adjacent to the Tennessee Gas Pipeline.

3.     The DREDGE NO. 9 owned by Diamond Services Corporation and propelled by the M/V VIVIAN owned by Central Gulf Towing, Inc., struck the starboard stern corner of the M/V SUSAN MORRISON on December 14, 1999.

4.     The M/V SUSAN MORRISON, CM5, the DREDGE NO. 9 and the VIVIAN were all vessels in navigation upon navigable inland waters of the United States on December 14, 1999;

5.     The plaintiff specifically does not stipulate to Nos. 2, 3, 4, 5, 6, 7 and 8 of Central Gulf Towing's listing of uncontested facts and Nos. 8 and 9 of Diamond Services Corp.'s listing of uncontested facts.

VIII.  **SINGLE LISTING OF CONTESTED ISSUES OF FACT:**

A.  DIAMOND SERVICES CORP.:

1.     The cost of repair to the TGP pipeline;

2.     Whether Diamond Services owes indemnity to Chet Morrison Contractors, Inc. and its customers;

3.     Whether Chet Morrison Contractors, Inc. owes contractual indemnity to Diamond Services Corporation for damages sustained by its customer, TGPI.

4.     Whether Diamond Services Corporation is entitled to contractual indemnity from Chet Morrison Contractors, Inc. for any sums it pays to CMC for repairs to CMC's customer damage to the pipeline;

5.     Diamond Services recovery over for any amounts paid to CMC for

- 28 -

repair to the TGP pipeline from CMC's general liability insurers, Commercial Underwriters Insurance Company;

6. The length of time it took to repair the pipeline;

7. The cause of the alleged damage to the pipeline;

8. Whether or not Diamond Services is entitled to limit its liability;

9. The negligence of TBS surveyors in marking the pipeline;

10. Whether Diamond Services is allowed to collect its counterclaim in the amount of $29,365.00 for services of the Dredge No. 9, and towage;

11. Whether Diamond Services is entitled to contribution and/or recovery over from TBS surveyors for their negligence in improperly marking the pipeline;

12 Nature and extent of the injuries of deckhand Foret;

13. The interpretation and meaning of the Diamond Services/Chet Morrison Contractors' Master Service Contract;

14. The seaworthiness of the Dredge No. 9.

B. TENNESSEE GAS PIPELINE COMPANY:

1. The amount of damages, if any, sustained by Tennessee Gas Pipeline Company

2. The indemnity owed to TGP by Chet Morrison Contractors, Inc. and its subcontractors

3. Whether TGP has been named as an additional insured under various insurance policies secured by Chet Morrison Contractors, Inc. and its subcontractors

4. The settlement agreement and/or oral agreement entered into between Chet Morrison Contractors, Inc. and TGP following the damage to TGP's pipeline.

- 29 -

C.  CMC:

    1.     The damages CMC is entitled to recover as a result of the repairs performed to the Tennessee Gas pipeline.

    2.     Whether Diamond Services had privity and knowledge of the negligence and/or unseaworthiness that caused the damage to the Tennessee Gas pipeline.

    3.     Whether Diamond Services is entitled to limit its liability to the value of the Dredge No. 9.

    4.     The value of the Dredge No. 9.

    5.     Whether Central Gulf had privity and knowledge of the negligence and/or unseaworthiness that caused the damage to the pipeline.

    6.     Whether Central Gulf is entitled to limit its liability to the value of the M/V VIVIAN.

    7.     The value of the M/V VIVIAN.

E.  TBS:

    1.     Whether the captain relied on any pipeline marker placed by TBS.

    2.     Whether the dredge captain's plan to move onto location from up-current was prudent given the strong current and the numerous pipelines crossing near the Tennessee Gas pipeline.

    3.     Whether the dredge's spud, after it was dropped, was dragged into the pipeline by the momentum of the dredge and the current;

    4.     There were at least fourteen buoys marking the line in the vicinity of the casualty.

    5.     The damage to the Tennessee Gas pipeline was caused by a spud from Diamond Services' Dredge No. 9 when it dropped its spur on the pipeline on December 14, 1999.

    6.     The Dredge No. 9 was made up and under tow by the tug boat M/V VIVIAN owned by Central Gulf Towing, Inc. when the damage

occurred.

7.    When the accident occurred, Chet Morrison Contractor, Inc. (CMC) was at the scene performing a contract it had with Tennessee Gas to lower a 24" Tennessee Gas pipeline.  Part of this contract required uncovering parts of the line which were buried under cover, so that the line could be moved and lowered.

8.    At the time of the casualty, Diamond Services had a sub-contract with CMC, under which Diamond Services was to dredge the top cover off of the pipeline with a clam shell dredge, to facilitate the work of CMC in lowering the pipe.

9.    In order to perform the dredging operation, the Dredge No. 9 had to be securely moored with its fore-and-aft center line directly over the pipe, with the end of the dredge with the boom and bucket pointed in the direction the dredging was to take place.

10.    The Dredge No. 9 was rigged with spuds, tubular pieces of steel fixed to the ends of the barge in collars, which permitted them to be lowered or raised as desired by the dredge captain.  The spuds were heavy steel, and when lowered would bury themselves in the bottom, thus serving to secure the dredge in one place.  With two spuds down, the barge was unable to move, making it a secure platform for dredging.

11.    The procedure Captain Pierre of the Dredge No. 9 used to get into the position described above was to approach the work site from up-current, and drop one spud to hold the dredge over the pipeline.  Thereafter, with the help of the VIVIAN, and the dredge's boom, bucket, and spuds, the Dredge No. 9 could maneuver itself into position directly over the pipeline;

12.    When the Dredge No. 9 lifted its spuds to move over the pipeline, there was a very strong current, estimating by the dredge captain and another witness at 10 knots, running from where the dredge was spudded down directly toward Tennessee Gas pipeline.

13.     When the Dredge No. 9 lifted its spuds, it was made up to the VIVIAN, which was to help the Dredge No. 9 get into position over the pipeline.

- 31 -

14. The spuds were lifted on the command of the captain of the dredge, and the movements of the dredge, and of the VIVIAN in aid of the dredge, were under the sole direction of the captain of the Dredge No. 9.

15. As the Dredge No. 9 approached the pipeline, to its starboard (right) the water became shallower, and the pipeline was marked by buoys close to the barge, and by cane poles stuck into the bottom over the pipeline. To the port (left), the pipeline was marked by buoys;

16. The buoys had been tied to the pipeline by divers not employed by TBS, but by a subcontract with CMC or Tennessee Gas;

17. The decision of where and when to drop the spud was entirely with the captain of the Dredge No. 9. The captain of the Dredge No. 9 relied only on the line of buoys marking the pipeline in deciding when and where it was safe to drop the spud so as not to hit the pipeline;

18. Dupre's crew arrived at the work site first on November 19, 1999, and no buoys marked the Tennessee Gas pipeline then. Dupre's crew never placed any buoys, although other parties placed buoys while Dupre's crew worked from November 19 - 24, 1999;

19. Guidry's crew arrived at the work site first on November 29, 1999. Two buoys marked the Tennessee Gas pipeline placed by others. That same day, Guidry's crew dropped a single weighted buoy to mark the Tennessee Gas line for the divers so they could more easily find it and put additional buoys on it prior to their beginning work. That buoy was dropped over 200' from where Captain Pierre dropped the Dredge No. 9 spud on the Tennessee Gas pipeline.

20. From November 19, 1999 until the day of the accident, December 14, 1999, TBS had only two crews working on the Tennessee Gas Pipeline: a crew led by Gary Guidry and one led by Harry Dupre.

F. Central Gulf Towing:

1. Whether or not the captain of the M/V VIVIAN failed to adequately contemplate for the current at the time of the collision with M/V SUSAN MORRISON.

2.      Whether or not Floyd Foret was injured as a result of the collision between M/V SUSAN MORRISON and Diamond DREDGE #9.

3.      Whether or not Floyd Foret can return to employment in the future and the wages which he is capable of earning if he can return to employment.

4.      Whether or not Floyd Foret has attempted to mitigate his damages.

5.      The amount of damages, if any, Floyd Foret is entitled to recover.

6.      Whether Diamond Dredge #9 had a value of $550,000.00 at the conclusion of the voyage of December 14, 1999;

7.      Whether Diamond Dredge #9's pending freight at he conclusion of the voyage was $25,000.00, for a total value of $575,000.00.

8.      Whether the M/V SUSAN MORRISON did not sustain significant hull damages as a result of the collision with the Diamond DREDGE #9.

9.      Whether the M/V VIVIAN had a fair market value of $450,000.00 at the conclusion of her voyage on December 14, 1999.

## G. PLAINTIFF, JOSEPH FORET:

1.      The negligence of Central Gulf Towing in the following particulars:

     a.      Failure to properly navigate its vessel and tow.
     b.      Failure to keep and post a proper lookout.
     c.      Failure to properly analyze and assess current, wind, and water conditions.
     d.      Failure to properly plan, configure its tow, and provide proper propulsion for the movement of the DREDGE NO. 9 into location.
     e.      Failure to control the movement of the DREDGE NO. 9.
     f.      Failure to provide a competent crew.
     g.      Lack of familiarity with the waters, conditions, and obstructions present.
     h.      Failure to warn of an impending collision.
     i.      Lack of possession of proper charts and maps.
     j.      Failure to choose an alternate available route to bring the DREDGE NO.

9 into position.

k.    In striking a stationary vessel.

l.    In providing a tug with insufficient power to conduct the movement of the DREDGE NO. 9 into position.

m.    In proceeding downward with the current, instead of bringing the dredge into position against the current.

n.    In failure to refuse an unsafe movement of the dredge.

2.    The negligence of Diamond Services Corporation in the following particulars:

a.    Improper planning, consultation and instruction for movement of the DREDGE NO. 9 into position.

b.    Failure to keep and post a proper lookout.

c.    Failure to properly analyze and assess current wind, water conditions and obstructions.

d.    Lack of familiarity with the current, waters and conditions present.

e.    Failure to consult proper maps and charts of the area.

f.    In directing that its dredge be improperly configured to the tow.

g.    Failure to warn of an impending collision.

h.    Failure to provide a competent crew.

i.    Failure to choose an alternate available route to bring the DREDGE NO. 9 into position.

j.    In striking a stationary vessel.

k.    Giving improper instructions to the M/V VIVIAN.

l.    In contracting a tug with insufficient power to conduct the movement of the DREDGE NO. 9 into position.

m.    In proceeding downward with the current, instead of bringing the dredge into position against the current.

3. Whether the M/V VIVIAN and the DREDGE NO. 9 were seaworthy at the outset of the voyage in question.

4. Whether defendants had privity or knowledge of the negligent and unseaworthy conditions which caused plaintiff's injuries.

5. The value of the DREDGE NO. 9 and its equipment and freight.

6. The value of the M/V VIVIAN and its equipment and freight.

7. The nature and extent of the pain and suffering, mental anguish, loss of enjoyment of life, loss of earnings, and medical expenses experienced and to be experienced by the plaintiff.

8. Quantum

9. The appropriate discount rate to be applied to plaintiff's future earnings.

10. Whether plaintiff is entitled to pre-judgment interest.

IX. **SINGLE LISTING OF CONTESTED ISSUES OF LAW:**

A. DIAMOND SERVICES:

1. The interpretation and effect of the terms and conditions of the Diamond Services/Chet Morrison Contractors master service contract, contractual indemnity and insurance provisions;

2. Whether Diamond Services Corporation is entitled to exoneration from and/or limitation of liability;

3. The negligence of any party; or

4. Diamond Services entitlement to contractual indemnity from CMC and/or its insurers for any claims made by CMC's customers under the terms of the CMC/Diamond master service contract.

B. TENNESSEE GAS PIPELINE COMPANY:

1. The meaning and effect of the indemnity and insurance provisions in the Alliance Agreement between TGP and Chet Morrison Contractors, Inc.

2. The enforceability of any oral agreements entered into between TGP and Chet Morrison Contractors, Inc. following the allision of December 14, 1999

3. Whether TGP is entitled to recover attorney's fees and costs associated with this litigation

4. Whether TGP is entitled to recover loss of revenues associated with the

allison

5.      The negligence of Chet Morrison Contractors, Inc. and its subcontractors

## C. CMC:

1.      Whether Diamond Services is entitled to limit its liability to the value of the Dredge No. 9.
2.      Whether Central Gulf is entitled to limit its liability to the value of the M/V VIVIAN.

3.      Whether the personal contract doctrine precludes Diamond Services from limiting its liability as regards CMC.

4.      Whether the personal contract doctrine precludes Central Gulf from limiting its liability as regards CMC.

## D. COMMERCIAL UNDERWRITERS INSURANCE CO.

1.      Whether the insurance provisions of the Diamond/CMC contract come before the indemnity provision.

2.      Whether the insurance provisions of the Central/CMC contract come before the indemnity provision.

3.      Whether contractual coverage is provided to CMC by Diamond's P&I carrier.

4.      Whether contractual coverage is provided to CMC by Central's P&I carrier.

5.      Whether CUIC provides contractual indemnity coverage to CMC for the indemnity undertaken by CMC in the contract between CMC and El Paso Energy Corporation.

6.      Whether CUIC provides contractual indemnity coverage to CMC for the indemnity assumed by CMC in the CMC/Diamond contract.

7.      Whether CUIC provides contractual indemnity coverage to CMC for the

- 36 -

indemnity assumed by CMC in the CMC/Central contract.

E. TBS:

1. Whether, while performing its contracted services, TBS' employees deviated from the professional standard of care for land surveyors.

2. Whether there is any evidence of negligence or dereliction by any TBS employee.

3. If there was any error or omission attributed to TBS, whether it caused, or was the proximate cause, of the pipeline damage.

F. CENTRAL GULF TOWING:

1. Medical causation of Floyd Foret's lumbar injury.

2. Whether or not Central Gulf Towing can limit its liability to the value of the M/V VIVIAN and pending freight.

3. Whether or not the collision between the M/V SUSAN MORRISON and Diamond DREDGE #9 was caused by an error in navigation.

4. The amount of damages, if any, Floyd Foret is entitled to recover.

G. PLAINTIFF, JOSEPH FORET:

1. Duties of defendants.

2. Entitlement of defendants to Limitation or Exoneration.

3. Unseaworthiness of the M/V VIVIAN and Diamond DREDGE NO. 9.

4. Negligence of defendants.

X. **EXHIBITS**

A. DIAMOND SERVICES CORP.:

1. Logs of Diamond Dredge No. 9;
2. Photographs of any vessels;

- 37 -

3.   Photographs of the pipeline marking;

4.   Charts and diagrams of the TGP pipeline and markings of the pipeline in Quatre Bayou;

5.   Drawings of the pipeline damage;

6.   Contracts between any other parties in question;

7.   Insurance policies of the parties;

8.   Master Service Contracts between the parties;

9.   Alliance agreements between the parties;

10.  Any document produced by Chet Morrison Contractors in support of its claim for repair to the pipeline;

11.  Logs of the CMC vessel;

12.  Chet Morrison's general repair procedures;

13.  Chet Morrison's initial work request form;

14.  Chet Morrison's diagram of nature and extent of damages;

15.  T. Baker Smith surveyors logs;

16.  Diamond Services Job Sheet Invoice No. 99-429 dated 1-4-00 in the amount of $29,365.00;

17.  Diamond Services Daily Boat Operating Report;

18.  Diamond Services Dredge Tickets;

19.  Any document produced in discovery;

20.  Any exhibit listed by any other party.

B. TENNESSEE GAS COMPANY:

1. Alliance Agreement with Chet Morrison Contractors, Inc.

2. Donnie Bergeron's logs from November-December 1999

3. Photographs of damaged pipe in question

4. Diagram of Four Bayous

5. Records of downtime or loss of use for TGP's pipeline

6. Records of any incidental costs incurred by TGP as a result of the allision, including legal fees and costs

7. Any exhibit(s) listed by any other parties.

CMC _may_ introduce the following exhibits:

1. CMC Invoice No. 19960 and supporting attachments;

2. CMC Invoice No. 19961 and supporting attachments;

3. CMC Invoice No. 19963 and supporting attachments;

4. CMC Invoice No. 19964 and supporting attachments;

5. CMC Invoice No. 19965 and supporting attachments;

6. CMC Invoice No. 19966 and supporting attachments;

7. CMC Invoice No. 20025 and supporting attachments.

8. CMC contract with Tennessee Gas Pipeline;

9. CMC contract with Diamond Services;

10. CMC contract with Central Gulf Towing;

11. Insurance policy issued to Diamond Services;

12.    Insurance policy issued to Central Gulf Towing;

13.    T. Baker Smith charts of pipeline location;

14.    Damaged pipe and/or photographs thereof;

15.    Any exhibit listed or introduced by any other party.

D.  COMMERCIAL UNDERWRITERS INSURANCE CO.:

1.    Certified copy of Commercial Underwriters Insurance Company's policy #BCG000460 issued to Chet Morrison Contractors;

2.    Certified copies of P & I policies #GCM99656 and GCM18875 issued to Diamond Services Corporation;

3.    Certified copy of P&I policy #P.I. 0814628 issued to Central Gulf Towing, Inc.;

4.    Copy of contract between Chet Morrison Contractors and Tennessee Gas Pipeline Company;

5.    Copy of Alliance Agreement between Chet Morrison Contractors and El Paso Energy;

6.    Copy of Master Service Contract between Chet Morrison Contractors and Diamond Services Corporation;

7.    Copy of Master Service Contract between Chet Morrison Contractors and Central Gulf Towing, Inc.;

8.    All damage supports provided by Chet Morrison Contractors concerning cost incurred in repairing of Tennessee Gas pipeline;

9.    Copy of graft prepared by Donald R. Remson of Rimkus that is attached to report of March 30, 2000;

10.    Bid proposal of Chet Morrison Contractors for performance of original work of Tennessee Gas Pipeline Company;

11.  Bid proposal/estimate of Chet Morrison Contractors for the repair of the Tennessee Gas pipeline;

12.  Map of area in question where casualty occurred;

13.  Pictures of Diamond Services Dredge #9;

14.  Logs reflecting work performed by Diamond Services Dredge #9;

15.  Copy of all records and logs kept by Donnie Bergeron, Tennessee Gas Pipeline Company;

16.  Copy of Stolt Comex Seaway job log for work done on pipeline;

17.  Chet Morrison Contractors Inspection Report, 12/15/99 with attachments;

18.  Copy of photos taken by Rimkus of repair work to pipeline;

19.  Any exhibit listed by any other party.

E.  TBS:

1.  Maps generated by TBS of the Tennessee pipeline project.
    i.      TBS Drawing No. 99780X1.DWG, with one revision, dated 11-30-2000.
    ii      TBS Drawing No. 99780X1.DWG, with no revisions, dated 11-30-2000.
    iii.    TBS Drawing No. 99700T1.DWG
    iv.     TBS Drawing No. 99700-78R.DWG, with no revisions, dated 11-16-1999
    v.      TBS Drawing No. 99700-78R.DWG, with one revision, dated 11-22-99.
    vi.     TBS Drawing No. 99780T2. DWG, dated 11-16-99.
    vii.    TBS Drawing No. 99780T3.DWG, dated 11-16-99.
    viii.   TBS Drawing No. 99780T4.DWG, dated 11-16-99.
    ix.     TBS Drawing No. 99700-79.DWG, dated 11-15-99.

2.  Deposition of Louis Pierre, including exhibits.

- 41 -

3.      Deposition of Donny Bergeron, including exhibits.

4.      Maps or plats of Quatre Bayou area, Bates Stamp TBS-0041 through TBS-0043.

5.      Donny Bergeron's handwritten daily log.

6.      TBS records of Tennessee Gas Pipeline Project

        i.     Surveyor's book kept by Harry Dupre, Bates Stamp TBS-0193 through TBS-0196.

        ii.    Surveyor's book kept by Gary Guidry, Bates Stamp TBS-0177 through TBS-0192 and TBS-0197 through TBS-0220.

        iii.   Personal notebook and day calendar of Gary Guidry

        iv.   Personal notebook and day calendar of Harry Dupre.

        v.    Time records of TBS personnel on the job.

        vi.   TBS invoices on the job, Bates Stamp TBS-0001 through TBS-0036 & TBS-0048 through TBS-0115.

        vii.  Color photographs taken by TBS employees, Bates Stamped TBS-0282 through TBS-0310.

7.      TBS' "Evergreen" Contract with Tennessee Gas Pipeline.

8.      Other TBS file records previously produced and Bates stamped.

9.      Any document listed by any other party.

F.  Central Gulf Towing:

1.      Ted Savoie's Affidavit of Value

2.      Logs - M/V VIVIAN

3.      Accident Reports

4.      Photographs of VIVIAN

5.      Photographs of Diamond DREDGE #9

6.  Photographs of SUSAN MORRISON

7.  Videos of SUSAN MORRISON

8.  Photographs of Mr. Foret's pirogue

9.  Videos of Mr. Foret's pirogue

10. IRS returns of Floyd Foret, Jr.

11. Social Security records of Floyd Foret, Jr.

12. Logs - M/V SUSAN MORRISON

13. Statement - Chris Billiot

14. Any exhibit listed or introduced by any other party to litigation

G.  PLAINTIFF, JOSEPH FORET:

1.  Logs of the M/V VIVIAN

2.  All accident reports pertaining to this matter.

3.  Photographs of the M/V VIVIAN.

4.  Photographs of the DREDGE NO. 9.

5.  Photographs of the M/V SUSAN MORRISON.

6.  Internal Revenue Service records.

7.  Social Security records.

8.  Logs of the M/V SUSAN MORRISON.

9.  Logs of the M/V VIVIAN.

10. Logs of the DREDGE NO. 9.

11.    Terrebonne General Hospital records.

12.    Diagnostic films and/or x-rays.

13.    Medical bills.

14.    Maps or plats of Quatre Bayou areas.

15.    Donnie Bergeron logs.

16.    Drawings from depositions taken.

17.    Contracts of the parties in question.

18.    Valuation documents of the vessels in limitation.

19.    Chet Morrison Contractors inspection report 12-15-99 with attachments.

20.    Terrebonne Physical Therapy records;

21.    Video of ten year old boy loading and unloading pirogue;

22.    Any exhibit listed or used by any other party.

## XI. **LIST OF DEPOSITION TESTIMONY TO BE OFFERED INTO EVIDENCE:**

A. Petitioner, Diamond Services Corporation, does not anticipate using deposition testimony of any witness at this time, but reserves the right to introduce the deposition of any witness, who is unavailable for trial, or for impeachment purposes. Diamond Services Corporation may use the deposition of any witness taken in discovery in order to shorten the length of trial as recommended by the Court.

C. CMC may offer the deposition of any witness unavailable for trial and for any other reason permitted under the Federal Rules of Civil Procedure and/or the Federal Rules of

Evidence.

E.  TBS - None.

G.  PLAINTIFF, JOSEPH FORET - may offer the deposition of Dr. Gary Guidry and any witness unavailable for trial.

XII.  **LIST OF CHARTS, GRAPHS, MODELS, SCHEMATIC DIAGRAMS:**

A.  Petitioner, Diamond Services Corporation, may use a blackboard during opening and closing arguments, and may also use charts, plats, and diagrams of the four bayous area, showing the location and markings of the undersea pipeline and buoys and flags, marking the pipeline, or any other form of demonstrative evidence during the trial of this matter.

B.  CMC may introduce charts, graphs, models, schematic diagrams and other similar objects which, although not to be offered into evidence, may be used in opening statement, closing argument, or for demonstrative purposes during trial.

C.  COMMERCIAL UNDERWRITERS INSURANCE CO.:

    1.    CUIC will utilize the graph prepared by Donald R. Remson attached to his report of March 30, 2000;

    2.    CUIC will utilize a map of the area where the collision/allision occurred.

If other objects are to be used by any party, they are to be submitted to opposing counsel at least three days prior to trial, and if there has been opposition to these, the dispute will be submitted to the court at least one day prior to trial.

G.  PLAINTIFF, JOSEPH FORET:

Plaintiff will utilize these items as necessary.

- 45 -

XIII.  **LIST OF WITNESSES:**

A.  Petitioner, Diamond Services, will call the following witnesses:

1.      Captain Louis Pierre
        5412 Carliss Street
        Sulphur, Louisiana
        Captain of the Dredge No. 9, to testify as to the facts and the circumstances of
        the alleged allision and/or damage to the pipeline;

Petitioner, Diamond Services may call the following witnesses:

1.      Lowell Harris, Jr.
        Diamond Services Corp.
        P.O. Box 1286
        Morgan City, Louisiana 70381
        To testify as to the facts and circumstances surrounding the collision and/or
        damage to the pipeline;

2.      Kenny Mimes
        Diamond Services Corp.
        P.O. Box 1286
        Morgan City, Louisiana 70381
        To testify as to the facts and circumstances surrounding the collision and/or
        damage to the pipeline;

3.      Steve Rowlinds
        Diamond Services Corp.
        P.O. Box 1286
        Morgan City, Louisiana 70381
        To testify as to the facts and circumstances surrounding the collision and/or
        damage to the pipeline;

4.      Gene Pierre
        Diamond Services Corp.
        P.O. Box 1286
        Morgan City, Louisiana 70381
        To testify as to the facts and circumstances surrounding the collision and/or
        damage to the pipeline;

5.   Roger MaClane
     Diamond Services Corp.
     P.O. Box 1286
     Morgan City, Louisiana 70381
     To testify as to the facts and circumstances surrounding the collision and/or
     damage to the pipeline;

6.   Dennis Pierre
     Diamond Services Corp.
     P.O. Box 1286
     Morgan City, Louisiana 70381
     To testify as to the facts and circumstances surrounding the collision and/or
     damage to the pipeline;

7.   Earl Hebert
     Diamond Services Corp.
     P.O. Box 1286
     Morgan City, Louisiana 70381
     To testify as to the facts and circumstances surrounding Diamond Services'
     counterclaim against Chet Morrison Contractors for payment of the services of
     the dredge and for towage;

9.   A representative of Diamond Services Corporation
     P.O. Box 1286
     Morgan City, Louisiana 70381
     To testify as to the facts and circumstances surrounding Diamond Services'
     counterclaim against Chet Morrison Contractors for damage to the alleged
     pipeline;

10.  Donnie Bergeron
     TGP
     224 Aviation Road
     Houma, Louisiana 70363
     To testify as to the facts and circumstances surrounding the alleged damage to
     the pipeline;

11.     Larry Slowik
        TGP
        224 Aviation Road
        Houma, Louisiana 70363
        To testify as to the oral agreement between CMC;

12.     Mike Bryan
        TGP
        224 Aviation Road
        Houma, Louisiana 70363
        To testify as to the oral agreement between CMC;

13.     Donald R. Remson, P.E.
        Rimkus Consulting Group, Inc.
        8 Greenway Plaza, Suite 500
        Houston, Texas   77046
        Expert testimony surrounding the reasonableness of Chet Morrison Contractors'
        claim for repair of the pipeline damage;

14.     W. P. Fincher, P.E.
        Rimkus Consulting Group, Inc.
        8 Greenway Plaza, Suite 500
        Houston, Texas   77046
        Expert testimony surrounding the reasonableness of Chet Morrison Contractors'
        claim for repair of the pipeline damage;

15.     A representative of Rimkus Consulting Group, Inc.
        8 Greenway Plaza, Suite 500
        Houston, Texas   77046
        Expert testimony surrounding the reasonableness of Chet Morrison Contractors'
        claim for repair of the pipeline damage;

16.     Joseph Foret
        Claimant herein, to testify as to the facts and circumstances surrounding his
        alleged injury and/or the marking of the pipeline;

17.     A representative of Stolt Comex Seaway, Inc.
        To testify as to the facts and circumstances surrounding the divers marking of
        the undersea pipeline;

18.   Chet Morrison
      P.O. Box 200398
      Dallas, Texas 75320-0398
      To testify as to the facts and circumstances surrounding CMC's claim for repair
      to the pipeline;

19.   Roger Falgout
      Chet Morrison
      P.O. Box 200398
      Dallas, Texas 75320-0398
      To testify as to the facts and circumstances surrounding CMC's claim for repair
      to the pipeline;

20.   Butch Poche
      Chet Morrison
      P.O. Box 200398
      Dallas, Texas 75320-0398
      To testify as to the facts and circumstances surrounding CMC's claim for repair
      to the pipeline;

21.   A representative of T. Baker Smith & Son, Inc.
      412 South Van Avenue
      Houma, Louisiana   70363
      To testify as to the facts and circumstances surrounding the marking of the
      undersea pipeline;

22.   Gary Guidry
      T. Baker Smith & Son, Inc.
      412 South Van Avenue
      Houma, Louisiana   70363
      To testify as to the facts and circumstances surrounding the marking of the
      undersea pipeline;

23.   Henry Dupre
      T. Baker Smith & Son, Inc.
      412 South Van Avenue
      Houma, Louisiana   70363
      To testify as to the facts and circumstances surrounding the marking of the
      undersea pipeline;

24.    Armand Cuevas and/or representatives of Intermodal Transportation Services,
       Inc.
       Intermodal Transportation Services, Inc.
       1411 Gause Blvd., Suite 2
       Slidell, LA 70458
       To testify as to the facts and circumstances concerning the surveying of the
       Dredge No. 9;

25.    Pat Aucoin and/or representatives of Aucoin Claim Services
       Aucoin Claims Service, Inc.
       864 Bellemeade Blvd.
       P. O. Box 1744
       Gretna, Louisiana   70054-1744
       To testify as to the facts and circumstances surrounding the alleged collision
       investigation;

26.    Any witness listed, used or called by any other party.

B.  TENNESSEE GAS PIPELINE MAY CALL WITNESSES:

       1.    Donnie Bergeron
             TGP
             224 Aviation Road
             Houma, LA  70363
             On-site company man at the time of the allision
              and following said allision

       2.    Larry Slowik
             TGP
             224 Aviation Road
             Houma, LA 70363
             Will testify as to any oral agreement reached with
              Chet Morrison following the allision, the Alliance
              Agreement with Chet Morrison Contractors, Inc.,
              and damages associated with the 12/14/99 accident

3.      Mike Bryan
         TGP
         224 Aviation Road
         Houma, LA 70363
         Will testify as to any oral agreement reached with
         Chet Morrison following the allision, the Alliance
         Agreement with Chet Morrison Contractors, Inc.,
         and damages associated with the 12/14/99 accident

4.      Any witness(es) listed by any other parties

C.  CMC <u>will</u> <u>call</u> the following witnesses:

1.      Donald J. Bergeron, Jr.
         401 Aspen Drive
         Houma, Louisiana 70360

         Mr. Bergeron will testify regarding the facts and circumstances surrounding the Tennessee Gas pipeline lowering project, this incident, the repairs performed by CMC, and other factual matters.

2.      Louis Pierre
         Post Office Box 403
         Hackberry, Louisiana

         Mr. Pierre will testify regarding the facts and circumstances surrounding this incident.

3.      Butch Porche
         Post Office Box 3301
         Houma, Louisiana 70363

         Mr. Porche will testify regarding the Tennessee Gas pipeline lowering project, the repairs performed by CMC to the Tennessee Gas pipeline following the incident, and CMC's invoices for the repairs.

4.    Gary Guidry
       300 Love Street
       Chauvin, Louisiana 70344

       Mr. Guidry will testify regarding the survey of the pipeline, the facts and circumstances surrounding this incident and other factual matter.

5.    Chet Morrison
       Post Office Box 3301
       Houma, Louisiana 70303

       Mr. Morrison will testify regarding the Tennessee Gas pipeline lowering project, the repairs performed by CMC to the Tennessee Gas pipeline following the incident, and CMC's invoices for the repairs.

CMC <u>may</u> <u>call</u> the following witnesses:

1.    A representative of Chet Morrison Contractors, Inc.

       A representative of Chet Morrison Contractors, Inc. may testify regarding the contractual relationship between CMC and Tennessee Gas, CMC and Diamond Services, CMC and Central Gulf Towing; the facts and circumstances surrounding the Tennessee Gas pipeline lowering project; the facts and circumstances surrounding the incident involved herein; the repairs performed by CMC, and other factual matters.

2.    A representative of Tennessee Gas Pipeline

       A representative of Tennessee Gas Pipeline may testify regarding the pipeline lowering project involved herein, the repairs performed by CMC to the Tennessee Gas pipeline and other factual matters.

3.    Leroy Guidry
       Post Office Box 3301
       Houma, Louisiana 70363

       Mr. Guidry will testify regarding the facts and circumstances surrounding the Tennessee Gas pipeline lowering project, this incident, the repairs performed by CMC, CMC's invoices for the repairs, and other factual matters.

4.    Any witness needed to authenticate any document.

5.    Any witness listed by any other party.

6.    Any witness identified through subsequent discovery.

D.  COMMERCIAL UNDERWRITERS INSURANCE CO.:

CUIC may call the following witnesses:

1.    Chet Morrison, Chet Morrison Contractors
      P.O. Box 3301
      Houma, LA
      Testimony regarding work performed by CMC and costs for work done;

2.    Leroy Guidry, Chet Morrison Contractors
      P.O. Box 3301
      Houma, LA
      Testimony regarding work performed by CMC and costs for work done;

3.    A representative of Commercial Underwriters Insurance Company
      P.O. Box 3649
      Culver City, CA 90231-3649
      Testimony regarding coverage under CUIC policy;

4.    Donald R. Remson, Rimkus Consulting Co.
      8 Greenway Plaza, Suite 500
      Houston, TX 77048
      Expert testimony regarding nature of repairs to pipeline and costs;

5.    W.G. Fincher, Rimkus Consulting Co.
      8 Greenway Plaza, Suite 500
      Houston, TX 77048
      Expert testimony regarding nature of repairs to pipeline and costs;

6.    Stephen Stark, Frontier Adjustors
      P.O. Box 2765
      Houma, LA
      Testimony concerning investigation into damages to pipeline;

7.     Rick Moore, Frontier Adjustors
       P.O. Box 2765
       Houma, LA
       Testimony concerning investigation into damages to pipeline;

8.     A representative of Diamond Services Corporation;

9.     A representative of Central Gulf Towing, Inc.;

10.    A representative of Tennessee Gas Pipeline Corp.;

11.    Donald J. Bergeron, Jr.
       Tennessee Gas Pipeline Corp.
       Testimony regarding damage to pipeline;

12.    Louis A. Pierre, Diamond Services Corp.
       Testimony regarding his movement of the Diamond Dredge #9;

13.    The captain of the M/V VIVIAN
       Testimony regarding his movement of the M/V VIVIAN and Diamond
       Dredge #9;

14.    Mike Bryan
       Tennessee Gas Pipeline Corp.
       Testimony regarding damage to pipeline and work to be performed by
       CMC;

15.    Roger Falgout
       Chet Morrison Contractors
       P.O.Box 3301
       Houma, LA
       Testimony regarding work done by CMC;

16.    Gary Guidry
       T. Baker Smith
       Testimony regarding work done by T. Baker Smith to mark pipeline;

17.   Tad Ellenberger
      Stolt Comex Seaway
      Testimony concerning work done by divers to mark pipeline and damage found;

18.   Harry Dupre
      T. Baker Smith
      Testimony regarding work done by T. Baker Smith to mark pipeline;

19.   Any witness listed by any other party.

E.  TBS:

Will call:

1.   Gary Guidry, facts, TBS party chief, regarding his involvement, daily instructions and items surveyed and marked on the Tennessee Gas Pipeline Project, the events prior to and after the accident, and the normal policies and procedures used on such a project.

2.   Harry Dupre, facts, TBS party chief, regarding his involvement, daily instructions and items surveyed and marked on the Tennessee Gas Pipeline Project and the events prior to the accident.

3.   Donny Bergeron, facts, Tennessee Gas Pipeline Company inspector, nature of the pipeline project, why it was necessary, his involvement, his instructions to the TBS employees on the project and his knowledge of the events prior to and after the accident.

May call:

1.   David Martinez, facts, TBS Vice President - Survey, as necessary to authenticate maps on TBS Exhibit List.
      TBS' Witness List was filed in accordance with prior court orders.

F.     A list of witnesses who will be called by Central Gulf Towing:

    1.     Ted J. Savoie
       Central Gulf Towing, Inc.
       P.O. Box 207
       Cut Off, Louisiana 70345
       Valuation of M/V VIVIAN, pending freight, and employment status of all employees on the M/V VIVIAN at the time of the casualty.

    2.     Lee Moss, M.D.
       2731 Napoleon
       New Orleans, Louisiana
       Testimony regarding examination of Floyd Foret, Jr.

    3.     Margo Hoffman and/or Judith Lide
       American Rehabilitation Consultants
       6600 Plaza Drive, Suite 200
       New Orleans, Louisiana, 70127
       Vocational rehabilitation exam of Mr. Foret.

    4.     John Sweeney, M.D.
       895 Verret Street
       Houma, Louisiana 70360
       Testimony regarding his examination of the plaintiff.

    5.     Ken Boudreaux, Stuart Wood, or Dan Cliff
       1424 Bordeaux Street
       New Orleans, Louisiana, 70115
       Testimony regarding economic report.

    6.     Danny Chaisson
       Central Gulf Towing, Inc.
       Cut Off, Louisiana
       Testimony regarding handling of the M/V VIVIAN.

A list of witnesses who may be called by Central Gulf Towing:

    1.     Curtis Callais
       Central Gulf Towing, Inc.
       Cut Off, Louisiana

- 56 -

Testimony regarding handling of the M/V VIVIAN.

2.     Jimmy Mobley
Central Gulf Towing, Inc.
Cut Off, Louisiana
Testimony regarding handling of the M/V VIVIAN.

3.     Joseph Floyd Foret, Jr. - cross examination of the plaintiff.

4.     Daniel Trahant, M.D.
1011 Verrett Street
Houma, Louisiana 70360
Testimony regarding examination of the plaintiff.

5.     Robert Davis, M.D.
895 Verrett Street
Houma, Louisiana 70360
Testimony regarding examination of the plaintiff.

6.     Richard Haydel, M.D.
502 Barrow Street
Houma, Louisiana 70360
Testimony regarding examination of the plaintiff.

7.     Gary Guidry, M.D.
1001 School Street
Houma, Louisiana, 70360
Testimony regarding examination of the plaintiff.

8.     Brian Matherne, M.D.
291 Liberty Street
Houma, Louisiana, 70360
Testimony regarding examination of the plaintiff.

9.     Cindy Matherne
Chet Morrison, Inc.
Houma, Louisiana
Testimony regarding condition of the M/V SUSAN MORRISON and treatment of the plaintiff.

10.    Chris Billiot
Houma, Louisiana
Testimony regarding the collision between the M/V SUSAN MORRISON and DREDGE #9.

11.    Dominic Foret
Houma, Louisiana
Testimony regarding the accident and his knowledge of the plaintiff.

12.    Semoon Chay - cross-examination
Testimony regarding Mr. Foret's economic losses.

> 13.    Tom Stewart - Cross examination ฿/C

14.    Any witness listed or called by any other party to this litigation.

## G. PLAINTIFF, JOSEPH FORET:

Will Call:

Joseph Foret, Jr.
102 Scott Street
Houma, Louisiana  70363
Background, facts and circumstances surrounding the impact, injuries and damages.

Dominick Foret
3811 Grand Caillou Road
Houma, Louisiana 70362
With respect to the collision and injuries to the plaintiff.

Dr. Gary Guidry
1001 School Street
Houma, Louisiana  70360
Treating orthopedist with respect to plaintiff's medical condition, surgery, and consequences thereof.

Dr. Semoon Chang, Economist
1100 Carolina Court
Mobile, Alabama  36695

Tom Stewart
Post Office Box 1482
Picayune, Mississippi 39466
Vocational Expert
Cross-examination, testimony regarding Mr. Foret's vocational rehabilitation.

PLAINTIFF, JOSEPH FORET:

May Call:

Cathy Verdin
102 Scott Street
Houma, Louisiana 70363
Plaintiff's physical and mental condition and activities prior to the accident and the impact of the accident upon his life.

Chris Billiot
443 Ashland Drive
Houma, Louisiana   70363
Captain of the SUSAN MORRISON with respect to the work activity, collision and injuries to the plaintiff.

Donald Bergeron
401 Aspen
Houma, Louisiana 70362
With respect to the project, facts and circumstances surrounding the collision, the conditions present, the competence of the captain of the DREDGE NO. 9, unseaworthiness and negligence.

Louis Pierre
5412 Carlos Drive
Hackberry, Louisiana
Captain of the DREDGE NO. 9 with respect how the collision occurred, planning, method of movement chosen, impact and consequences thereof.

Lowell Harris, Jr.
P.O. Box 1286
Morgan City, Louisiana 70381
Testify to the facts and circumstances of collision

Curtis Callais
Central Gulf Towing, Inc.
Cutoff, Louisiana
Testify to the facts and circumstances of collision

Danny Chaison
Central Gulf Towing, Inc.
Cutoff, Louisiana
Testify to the facts and circumstances of collision

Jimmy Mobly
Central Gulf Towing, Inc.
Cutoff, Louisiana
Testify to the facts and circumstances of collision

Mike Gregois
CMC employee
Testify regarding plaintiff's work performance and injuries

Dr. Daniel Trahan
1011 Verrett Street
Houma, Louisiana
Testify to the treatment of plaintiff and diagnostic test results

Dr. Robert Davis
895 Verret Street
Houma, Louisiana  70360
With respect to initial treatment, company physician with respect to initial treatment of
plaintiff.

Dr. John Sweeney
895 Verret Street
Houma, Louisiana 70360
Company specialist with respect to examination of the plaintiff.

Dr. Richard Haydel
502 Barrow Street
Houma, Louisiana  70360
With respect to treatment of plaintiff's back condition.

Dr. Brian Matherne
291 Liberty Street
Houma, Louisiana   70360
With respect to initial treatment of plaintiff and MRI.

Any witness listed or called by any other party to this litigation.

b. Witness lists were filed in accordance with prior Court orders. No other witness shall be allowed unless agreeable to all parties and their addition does not affect the trial date. This restriction will not apply to rebuttal witnesses or documents whose necessity cannot be reasonable anticipated. Furthermore, in the case of expert witnesses, counsel certify they have exchanged expert reports in accordance with prior court orders. Expert witnesses whose reports have not been furnished opposing counsel shall not be permitted to testify nor shall experts be permitted to testify to opinions not included in the reports timely furnished;

c. Except for good cause shown, the Court will not permit any witness to testify unless with respect to such witness there has been complete compliance with all provisions of the Pre-Trial Order and prior Court order;

d. Counsel shall not be allowed to ask questions on cross-examination of an economic expert which would require the witness to make mathematical calculations in order to frame a response unless the factual elements of such question shall have been submitted to that expert witness not less than three full working days before trial.

XIV. **JURY/NON-JURY:**

This is a non-jury case. In a non-jury case, suggested findings of fact and conclusions

- 61 -

of law and a separate trial memorandum are required, unless the Court enters an order that such

is not required.  Same are to be submitted not less than five full working days prior to trial.

### XV.  **BIFURCATION:**

The issue of liability (will or will not) be tried separately from that of quantum.

### XVI.  **STATEMENT OF OTHER MATTERS:**

The parties are unaware of any other matters that might expedite the disposition of the

case.

### XVII.  **TRIAL LENGTH:**

Trial shall commence on Monday, May 7, 2001 at _____ A.M.  It is estimated that

trial will last three days.

### XVIII.  **CONFERENCE AMONG COUNSEL:**

This Pre-Trial Order has been formulated after conference at which counsel for the

respective parties have appeared in person.  Reasonable opportunity has been afforded counsel

for corrections, or additions, prior to signing.  Hereafter, this Order will control the course of

the trial and may not be amended except by consent of the parties and the Court, or by order

of the Court to prevent manifest injustice.

### XIX.  **SETTLEMENT:**

The possibility of settlement of this case was considered with Magistrate-Judge Lance

Africk on March 23, 2001.  A second settlement conference may be scheduled after completion

of CMC's damage witness' depositions which will be taken in April, 2001.

New Orleans, Louisiana, this 3rd day of April, 2001.

UNITED STATES DISTRICT JUDGE

MICHAEL L. McALPINE, T.A. (#9195)
RICHARD A. COZAD (#4537)
ROBERT B. ACOMB, III (#2303)
McALPINE & COZAD
701 South Peters St., Suite 300
New Orleans, LA 70130
Telephone:  (504) 561-0323; Fax:  528-9442
*Attorneys for Diamond Services Corporation*

Grady S. Hurley, Esq. (#13931)
Christopher S. Mann, Esq. (#26397)
Jones, Walker, Waechter, Poitevent,
  Carrere & Denegre, L.L.P.
201 St. Charles Avenue
New Orleans, LA 70170
Telephone: (504) 582-8224; Fax: 582-8010
*Attorneys for Tennessee Gas Pipeline, Inc.:*

Robert S. Reich, (#11163)
Lawrence R. Plunkett, (#19739)
Reich, Meeks & Treadaway
Two Lakeway Center, Suite 1000
3850 N. Causeway Blvd.
Metairie, LA 70002
Telephone: (504) 830-3999; Fax: 830-3950
*Attorneys for Central Gulf Lines, Inc.:*

- 63 -

J. Daniel Rayburn, Jr., (#11404)
Leonard & Leonard, Ltd.
2448 Johnson Street
P. O. Box 91823
Lafayette, LA 70509-1823
*Attorneys for Commercial Underwriters Insurance Co.*

Charles F. Seeman, Jr.
Keith J. Bergeron
Deutsch, Kerrigan & Stiles
755 Magazine Street
New Orleans, Louisiana   70130
Telephone: (504) 581-5141; Fax: 566-1201
*Attorneys for T. Baker Smith & Son, Inc.*

Scott R. Wheaton, Jr.
Stanley J. Cohn
Lungenbuhl, Burke, Wheaton,
 Peck, Rankin & Hubbard
Pan-American Life Center Blvd.
601 Poydras Street, Suite 2775
New Orleans, LA 70130
Telephone: (504) 568-1990; Fax: 529-7418
*Attorneys for Central Gulf Towing, Inc.*

David A. Hilleren
Billy Wright Hilleren
Hilleren & Hilleren
P. O. Box 9150
Mandeville, LA 70470
*Attorneys for Joseph Foret, Jr.*